INDEPENDENT PETROCHEMICAL
CORPORATION, et al., Plaintiffs,

v.

AETNA CASUALTY AND SURETY
COMPANY, et al., Defendants.

Civ. A. No. 83–3347.

United States District Court,
District of Columbia.

Feb. 4, 1986.

Alan G. Miller, Mitchell S. King, Hunter O'Hanian, Morrison, Mahoney & Miller, Boston, Mass., for U.S. Fire Ins. Co.

Michael Gallagher, Katheryn A. Dux, German, Gallagher & Murtaugh, Philadelphia, Pa., for Stonewall Ins. Co.

Lawrence E. Carr, Jr., Margaret H. Warner, Carr, Goodson & Lee, Washington, D.C., for The Continental Ins. Co.

James T. Wharton, Digges, Wharton & Levin, Annapolis, Md., for Midland Ins. Co.

Richard H. Gimer, Stephen L. Humphrey, Hamel & Park, Washington, D.C., for The American Employers' Co., Commercial Union Ins. Co.

James W. Greene, Charles O'Hara, Bromley, Brown & Walsh, Washington, D.C., for Continental Cas. Co., North Star Reinsurance Corp., Unigard Mut. Ins. Co., American Re-Ins. Co.; Mission Ins. Co.

James P. Schaller, M. Elizabeth Medaglia, Timothy R. Dingillian, Jackson & Campbell, Washington, D.C., for American Home Assur. Co., The Ins. Co. of the State of Pa., Lexington Ins. Co.

Robert E. Heggestad, Casey, Scott & Canfield, Washington, D.C., for Harbor Ins.

Martin R. Baach, Michael Nussbaum, Eric L. Lewis, Nussbaum, Owen & Webster, Washington, D.C., Harry S. Redmon, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., John G. McAndrews, Mendes & Mount, New York City, for Certain Underwriters at Lloyd's London, London Market Ins. Companies.

Peter J. Schlesinger, Simpson, Thacher & Bartlett, New York City, Douglas B. Mishkin, Melrod, Redmon & Gartlan, Washington, D.C., for The Travelers Indem. Co.

Dennis M. Flannery, W. Scott Blackmer, Alan S. Tenenbaum, Wilmer, Cutler & Pick-

ering, Washington, D.C., for Ins. Co. of North America.

James E. Rocap, III, Martin D. Minsker, Stephen L. Nightingale, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Aetna Cas. & Sur. Co.

Jerold Oshinsky, Sherry W. Gilbert, Robert H. Shulman, Patricia A. Van Dyke, David M. Halbreich, Anderson, Baker, Kill & Olick, Washington, D.C., Mark Hulsey, Tim E. Sleeth, Smith & Hulsey, Jacksonville, Fla., for plaintiffs Independent Petrochemical Corp., The Charter Co., Charter Oil Co.

John P. Arness, P.C., Jamie M. Bennett, Hogan & Hartson, Washington, D.C., for Hartford Acc. & Indem. Co., First State Ins. Co.

MEMORANDUM

FLANNERY, District Judge.

This matter comes before the court on a variety of motions: (1) plaintiffs' motion for partial summary judgment regarding the method of triggering coverage of certain liability insurance and regarding defendants' obligation to pay defense costs for civil actions against plaintiffs; (2) defendants' motion to strike the affidavit of Thomas J. Terbrueggen which accompanies plaintiffs' motion for partial summary judgment; (3) defendant Pacific Indemnity Company ("Pacific")'s motion for summary judgment recognizing that Pacific never insured plaintiffs during the time in question; and (4) plaintiffs' cross motion for summary judgment against Pacific on the same issue.

I. *Background*

Plaintiff Independent Petrochemical Corporation ("IPC") is primarily in the business of terminaling and marketing various petrochemical products in Missouri. IPC is a wholly-owned subsidiary of plaintiff Charter Oil Company ("Charter"), which in turn is owned by plaintiff The Charter Company ("TCC"). Plaintiffs have filed for Chapter 11 bankruptcy in Florida.

Defendants are 23 insurance companies that sold 67 primary and excess liability insurance policies to plaintiffs from 1971 to 1983, for which plaintiffs paid in excess of $10 million and which provide coverage of approximately $1.115 million for each "occurrence" of certain "bodily injury" and "property damage."

In 1971, IPC agreed to help one of its customers, Northeastern Pharmaceutical and Chemical Company ("NEPACCO"), to remove waste products from a holding tank at NEPACCO's facility in Verona, Missouri. IPC did this by contacting an independent contractor, Russell Martin Bliss, who removed over twenty thousand gallons of waste products. It is now alleged that this waste material contained a concentration of dioxin, a toxic element that can cause physical injury.[1] Bliss allegedly mixed these waste products with waste oils he collected from other sources and sprayed the mixture as a dust suppressant at a number of sites in Missouri.

Fifty-seven civil actions involving more than 1,600 claimants have been filed in other courts against plaintiffs, as well as class actions and suits by the State of

---

1. "Dioxin" is a name for an entire family of chemical compounds. The name refers to these compounds' basic structure: two oxygen atoms joining a pair of benzene rings.

One of defendants' objections to summary judgment at this time is that there has been no showing that dioxin causes a continuous, injurious process. Defendants submit an affidavit by Dr. Raymond D. Harbison (Attachment A of Joint Opposition of Defendants to Plaintiffs' Motion for Partial Summary Judgment, filed September 16, 1985) to show that the only adverse affects to humans from dioxin are chloracne (a

skin condition) and prophyria cutanea tarda (a liver dysfunction). It is defendants' position that progressive injury must be shown before the relief requested by plaintiff may be granted.

There is disagreement within the scientific community over whether dioxin exposure has any serious long-term effect on human beings. *See, e.g.,* Tschirley, *Dioxin,* Scientific American, Feb. 1986. For the reasons stated below, discussion of this matter is deferred until this court rules on the trigger-of-coverage relief sought by plaintiff.

Missouri and the United States.[2] Most of the claims allege bodily injury and property damage from exposure to the contaminated spray material . One aspect of the claims is that they allege "delayed-manifestation" injury, meaning continuous and progressive damage from the exposure. The individual claimants seek in aggregate $4 billion in bodily injuries and property damage, as well as $4 billion in punitive damages.

Some of the claims have been settled. Four of plaintiffs' six primary insurance companies [3] have agreed to pay all of plaintiffs' defense costs for the time being in the remaining actions pursuant to a Standstill Interim Defense Agreement. Although the parties have attempted to negotiate a final settlement of defendants' obligations to defend and indemnify plaintiffs in the dioxin-related claims, no such settlement has been reached.

Although the insurance policies vary in minor ways, language from a representative policy [4] is as follows:

The "Coverage" provision states:

The company will pay on behalf of the insured all sums which the insured shall become legally obliged to pay as damages because of

bodily injury or property damage

to which this insurance applies, caused by an occurrence . . . .

The term "occurrence" is defined as:

an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage

neither expected nor intended from the standpoint of the insured.

"Bodily injury" is defined as:

bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

"Property damage" is defined as"

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The "defense" provision states:

the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent. . . .

Suit was filed in this court by plaintiffs in November of 1983. On June 14, 1985, plaintiffs filed a motion for partial summary judgment. Plaintiffs seek a declaration of the primary insurance carriers' obligations to defend plaintiffs against the dioxin-related claims on a final basis and a declaration of the primary and excess insurance carriers' obligations to indemnify plaintiffs for settlements and judgments, if any, in the dioxin-related claims.

Defendants were allowed to file jointly and individually papers under seal because

---

**2.** These actions are currently in pretrial stages and will be referred to throughout this Memorandum as "dioxin-related claims." Exhibit 3 to Plaintiffs' Affidavit of Thomas J. Terbrueggen contains five complaints representative of these claims.

**3.** The primary insurance carriers are Aetna Casualty & Surety Company ("Aetna"), Continental Insurance Company ("Continental"), Insurance Company of North America ("INA"), Pacific Indemnity Company ("Pacific"), The Travelers Indemnity Company ("Travelers"), and Hartford Accident and Insurance Company ("Hartford").

Continental is contributing to the defense of its single named insured, plaintiff TCC. Pacific is contributing nothing for reasons discussed

below concerning its motion for summary judgment.

**4.** The provisions in the text are taken from Aetna policy number 39 AL 219867 SCA. See Exhibit 1 to Affidavit of Thomas J. Terbrueggen for a list of which insurers' policies covered plaintiffs for each year 1971 to 1983. The pertinent policy provisions of the primary comprehensive general liability policies issued to plaintiffs were filed September 20, 1985, as Attachment F (Defendants' Exhibit of Illustrative Policy Provisions) to their Joint Opposition to Plaintiffs' Motion for Partial Summary Judgment. Provisions regarding the excess policies appear in the same attachment.

of the sensitive nature of the information the insurance companies have had to reveal in their defenses. Defendants have moved to strike the affidavit of Thomas J. Terbrueggen, which plaintiffs submitted to support their motion.

Jointly, defendants oppose this court reaching such a summary declaration, contending that more time for discovery is needed. As defendants see it, there are genuine facts still in dispute regarding the dioxin-related claims and the applicability of the insurance policies to these claims. Defendants also argue that it is not clear which state's law applies to this action.

Individually, some defendants have raised objections peculiar to their particular policies. For instance, defendant Aetna argues that it was never made aware of existing dioxin-related claims when its policy was implemented in 1974. Absent such disclosure, the policy was procured through misrepresentation. Defendant Continental argues that it only insured plaintiff TCC and in a Florida lawsuit TCC itself seeks to establish that TCC's corporate liability for IPC's activities is a material issue of disputed fact. Defendant INA asserts that the definition of "occurrence" in its policy as well as the failure to disclose prior dioxin exposure precludes application of its policy. Certain excess insurers have also made individual objections. Defendant U.S. Fire Insurance Company ("U.S. Fire") argues that its policies can only be construed according to New York law. U.S. Fire has counterclaimed against plaintiffs, asserting fraud, misrepresentation, and failure to disclose material facts. Certain London defendants (underwriters at Lloyd's of London and companies in the London market) argue that language in their policies prohibit cumulation of policy limits and that on the evidence before the court, plaintiffs can be shown to have expected the dioxin injuries. Defendant Stonewall Insurance Company asserts that its provisions on the limits of liability may be incompatible with plaintiffs' requested relief. Many of the defendants assert that pollution-exclusion clauses in their policies prevent application of the policies to the dioxin-related claims.

One of the defendants, Pacific Indemnity Company, contends that it never insured IPC as a subsidiary of Charter (it had insured IPC as a subsidiary of another company prior to the dioxin-spraying) and therefore summary judgment should be granted against plaintiffs' claims regarding Pacific. On September 16, 1985, plaintiffs responded to this with their own motion for summary judgment against Pacific on the same issue.

Each of the motions will be considered separately. At the outset, this court notes that an action such as this requires a careful balancing of interests. There is clearly an efficiency and a justness in providing declaratory relief to an insured who—in the face of numerous civil actions—must suffer the conflicting views of its insurers regarding which insurers' policies apply. On the other hand, while general principles of insurance law do arise from standard insurance language, not all insurance companies and their policies can be blindly grouped together. Sweeping relief is appropriate only if necessary and not premature. Inevitably, certain issues of fact and law will be left to some future time when the actual litigation of the underlying dioxin-related claims occurs.

## II. *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs' motion for partial summary judgment seeks an order from this court that would allow three things. First, each insurer whose policy was in force at any time from a dioxin claimant's "first exposure or application" through the "last manifest development of bodily injury or property damage" would be required to pay in full for plaintiffs' liability, if any, for that claim. Second, each primary insurer would be obligated to pay plaintiffs' full defense costs in each underlying dioxin-related claim unless the insurer can demonstrate that no part of the alleged bodily injury or property damage process could have occurred during that insurer's policy period.

Third, plaintiffs would have the right to select which policy should indemnify and which policy should defend for any given dioxin-related claim, including the right to choose different policies for defense and indemnity on the same claim.

### A. Resolving the "Trigger-of-Coverage" Question

As noted above, the underlying dioxin-related claims allege "delayed-manifestation" injury, meaning that a period of time elapsed between the time of the exposure to the dioxin and the time the injury became apparent. Since different insurance companies may have insured for such injury over this period of time, the question arises of which *trigger-of-coverage* theory should be used.

■ Under a *manifestation-only* theory, the only insurance policy triggered to cover a claim would be the one in place at the time the injury becomes manifest. Under an *exposure-only* theory, the only insurance policy triggered to cover a claim would be the one in place when the exposure occurred. If exposure took place over a time period in which many insurance companies provided coverage, liability might be assigned to an insurance company for the number of years it provided coverage. In this action, at the time the underlying dioxin-related claims arose and were referred by plaintiffs to defendants, defendants stated their positions by asserting one of these two theories.[5]

■ Plaintiffs seek a declaratory judgment that the theory appropriate for delayed-manifestation claims is a *multiple-trigger* theory, such as was applied by this circuit in *Keene Corp. v. Insurance Co. of North Am.*[6] Under the *Keene* theory, every policy in effect at any time during the injury process, from the initial exposure until the last manifest development of the injury, is triggered for coverage of any liability.

Thus, plaintiffs seek a ruling that each insurance policy of defendants in effect at any time during the alleged bodily injury or property damage process—from first exposure or application through the last manifest development of bodily injury or property damage—in a dioxin-related claim is triggered to provide coverage for full payment of a claim up to the limits of the policy. Plaintiffs argue that *Keene* and its progeny are precedents which this court is obligated to follow. Alternatively, plaintiffs believe this court should find that the proper legal construction of general insurance policy language requires application of the trigger-of coverage theory.

The *Keene* case involved the obligations of liability insurance companies to a policyholder manufacturer that was incurring legal liability for injuries allegedly caused by exposure to asbestos-containing products. Exposure to these products, as with exposure to dioxin, was alleged to cause progressive injury which only manifested itself years after the exposure. This circuit's court of appeals held that the coverage of

**5.** For application of the manifestation-only approach, *see Eagle-Picher Indus. Inc. v. Liberty Mut. Ins. Co.*, 523 F.Supp. 110 (D.Mass.1981), *aff'd as modified*, 682 F.2d 12 (1st Cir.1982), *cert. denied*, 460 U.S. 1028, 103 S.Ct. 1280, 75 L.Ed.2d 500 (1983). For application of the exposure-only approach, *see Porter v. American Optical Corp.*, 641 F.2d 1128 (5th Cir.1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

**6.** 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875, *rehearing denied*, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982).

Aside from *Keene*, this method has also been used in *Eli Lilly & Co. v. Home Insurance Co.*, 653 F.Supp. 1 (1984), *set aside and certified to Indiana for resolution of certain questions*, 764 F.2d 876 (D.C.Cir.1985); *Abex Corp. v. Maryland Cas. Co.*, No. 82–2098 (D.D.C. Apr. 16, 1985) [Available on WESTLAW, DCTU database], *appeals docketed*, Nos. 85–5602, –5659, –5660 (D.C.Cir. May 3 and May 28, 1985); *Owens-Illinois, Inc. v. Aetna Cas. & Surety Co.*, 597 F.Supp 1515 (D.D.C.1984), *appeal docketed*, No. 85–5285 (D.C.Cir.1985); *ACandS, Inc. v. Aetna Cas. & Surety Co.*, 576 F.Supp. 936 (E.D.Pa.1983), *appeals docketed*, 764 F.2d 968 (3d Cir.1985); *Sandoz, Inc. v. Employer's Liability Assurance Corp.*, 554 F.Supp. 257 (D.N.J.1983); *Vale Chem. Co. v. Hartford Accident & Indemnity Co.*, 340 Pa.Super. 510, 490 A.2d 896 (1985); *Crown, Cork & Seal Co. v. Aetna Cas. & Surety Co.*, No. 1292 (Pa.Ct.C.P., Phil.Cty., Aug. 2, 1983).

the policies was triggered under each policy in effect at any time during the entire injury process and that the insured could select any triggered policy for a full defense of an asbestos-related claim. Judge Wald suggested why such a flexible formula was preferable for this type of injury:

> This process-oriented definition not only provides a flexible formula for adjudicating the legal issues associated with asbestos-related diseases, but also sets a useful precedent for other product-exposure injuries, as of yet unknown in origin. Further, the more comprehensive definition will give much needed certainty to the insurance industry, currently rent asunder by advocates of exposure and manifestation, whose fluctuating positions often depend upon their economic interests in a particular case, and by differing judicial rulings which seem to depend at least partially upon the equities of each case.

667 F.2d at 1058 (Wald, J. concurring). After considering the laws of Delaware, New York, the District of Columbia, Pennsylvania, Connecticut, and Massachusetts, *Keene* rested its analysis on three principles of insurance law common to all those jurisdictions: (1) insurance policies must be construed to give effect to the policies' dominant purpose of indemnity; (2) ambiguities in an insurance contract must be construed in favor of the insured; and (3) the court should give effect to the reasonable expectations of the policyholder. Plaintiff argues that *Keene* and its progeny are binding on this court because the relevant insurance policy language in this case and the injury alleged are basically identical to that found in *Keene*.

Defendants do not offer any particular alternative to the multiple-trigger theory, but instead argue that the trigger-of-coverage should not be determined at this point at all. While other factors may preclude such judgment as well, defendants correctly point out that the state law controlling this action has not yet been determined. This court agrees that such a determination is necessary under the *Erie* doctrine [7] prior to deciding the trigger-of-coverage issue.

In *Eli Lilly, supra* note 6, another case that considered the multiple-trigger (this time for DES injuries), the insurers had no connection with the District of Columbia other than being subject to personal jurisdiction here. This Circuit's Court of Appeals found that Indiana law controlled and therefore the court certified the trigger-of-coverage question to the Supreme Court of Indiana pursuant to Indiana's certification statute.

In this case, defendants also have no connection with the District of Columbia other than being subject to personal jurisdiction here. Unfortunately, the parties have raised the choice of law issue but not pursued the District of Columbia "interest analysis" test to ascertain a controlling body of state law.[8] This court's denial of defendants' motion to transfer, which argued in favor of application of Florida law, did not actually decide what law governs.[9] From the pleadings, it is clear that various states have contacts with this action and would have an interest in applying their substantive law. For instance, some of the insurance policies say that they are governed by the law of New York. Yet negotiations of various insurance policies took place across the country, in Florida, California, Georgia, Louisiana, and Texas. IPC

---

7. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

8. *See Blair v. Prudential Ins. Co.,* 472 F.2d 1356, 1359 (D.C.Cir.1972); *Fowler v. A & A Co.,* 262 A.2d 344, 348 (D.C.1970).

Defendant U.S. Fire Insurance Co. has somewhat pursued a choice of law analysis, arguing that with some additional facts it would be clear

that provisions within its policies calling for application of New York law should be given effect. The court defers consideration of this argument pending briefings by plaintiffs and the primary insurers.

9. *Independent Petrochem. Corp. v. Aetna Cas. & Surety Co.,* No. 83–3347, mem. op. at 7 (D.D.C. Aug. 13, 1984) (Flannery, J.) [Available on WESTLAW, DCTU database].

is incorporated in Ohio but has its principal place of business in Missouri. Charter and TCC are incorporated in Florida. Of course, the underlying claims arise in Missouri.

Plaintiffs contend, however, that plaintiffs' motion can be granted under the laws of any of these jurisdictions. As they see it, where none of the various laws of the potential states gives specific guidance in resolving the case, the basic principles governing the interpetation of insurance policies (which all the states follow) should be used, inasmuch as there is no conflict of laws.[10] Thus, even if the *Keene* line of cases is not binding on this court because D.C. local law is not necessarily controlling, the general principles that guided the court in *Keene* (e.g., giving effect to the insured's reasonable expectations) should control.

While there are some general principles of insurance law accepted nationwide, the *Keene* multiple-trigger theory is not uniformly accepted as flowing from such principles. The Second Circuit rejected the *Keene* theory and adopted an "injury in fact" interpretation instead. *American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 565 F.Supp. 1485 (S.D.N.Y.1983), *aff'd as modified*, 748 F.2d 760 (2d Cir.1984). Plaintiffs argue that subsequent New York state cases override *American Home Products, see Servidone Constr. Corp. v. Security Ins. Co.*, 64 N.Y.2d 419, 488 N.Y. S.2d 139, 477 N.E.2d 441 (1985), and instead support a continuous or multiple trigger. *Autotronic Sys., Inc. v. Aetna Life & Cas. Co.*, 89 A.D.2d 401, 456 N.Y.S.2d 504 (3d Dept.1982); *Schultheis v. Centennial Ins. Co.*, 108 Misc.2d 725, 438 N.Y. S.2d 687 (Sup.Ct.1981). *But see Allstate Ins. Co. v. Colonial Realty Co.*, 121 Misc.2d 640, 468 N.Y.S.2d 800 (Sup.Ct. 1983).

The Fifth Circuit, applying Louisiana law, has used an exposure-only theory, though in doing so it does not seem to have actually considered the multiple-trigger theory. *Porter, supra* note 5; *Ducre v. Executive Officers of Halter Marine, Inc.*, 752 F.2d 976 (5th Cir.1985).

The First Circuit, citing Illinois and Ohio law, has applied a "manifestation-only" theory. *Eagle Picher, supra* note 5.

In Missouri, where the dioxin-related claims allegedly triggering the insurance policies arose, a federal district court has declined to accept any multiple-trigger theory absent an appropriate factual record. *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.*, No. 84–5034–CV–S–4 (W.D.Mo. June 25, 1985) [Available on WESTLAW, DCTU database] *appeal docketed*, No. 85–1940–WM (8th Cir.1985). In that case, the court found that:

> a more proper determination of the various issues concerning the insurer's duty to defend and to indemnify can be made after more specific findings of bodily injury and property damage are made. Certainly, a court could not attempt to resolve these major issues concerning insurance coverage for victims of hazardous waste disposal without having determined the various policy considerations and medical facts of each case.

Slip. op. at 15.

The Third Circuit, despite *ACandS, supra* note 6, declined to extend *Keene* beyond the asbestos personal injury context to a toxic waste coverage dispute. *Riehl v. Travelers Insurance Co.*, 772 F.2d 19 (3d Cir.1985). Yet that court also never actually decided the trigger-of-coverage question. The *Riehl* court also sought development of a more complete factual record, but this may have been because there was no evidence of when the dumping began or who did it.

---

**10.** Plaintiffs cite this court's decision in *Turner & Newall, PLC v. American Mut. Liability Ins. Co.*, No. 82–1339, mem. op. at n. 1 (D.D.C. Aug. 1, 1985) (Flannery, J.) [Available on WESTLAW, DCTU database]. That decision, however, recognized that District of Columbia conflicts law pointed to Pennsylvania local law as determinitive of the specific issues before the court. *Id.*

Most recently, the Ninth Circuit rejected the multiple-trigger theory in favor of an exposure-only trigger-of-coverage in considering insurance coverage for cumulative and progressive injury incurred from implantation of a contaminated heart valve. *Hancock Laboratories Inc. v. Admiral Ins. Co.*, 777 F.2d 520 (9th Cir.1985) (Reed, J. sitting by designation). That court relied on the Sixth Circuit, which has also adopted the exposure-only theory. *Insurance Co. of North Am. v. Forty-Eight Insulations*, 633 F.2d 1212 (6th Cir.1980), *modified*, 657 F.2d 814, *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (citing Illinois and New Jersey law).

▪ This court finds that a conflict of laws exists on this issue. The trigger-of-coverage regarding defendants' liability for the dioxin-related claims cannot be decided until it is determined (1) which state has the "more substantial interest" in the resolution of the trigger-of-coverage issue; (2) which trigger-of-coverage theory that state would adopt; and (3) whether in that state extrinsic evidence would be required to construe the contracts at issue in this case. To this end, the parties should submit short briefs to aid the court in its decision. Additional discovery is not necessary to conduct this inquiry; enough facts concerning the underlying dioxin-related claims and the policies involved are ascertainable at this point to make this choice of law determination.

B. *Legal Duty of Each Primary Defendant to Defend Plaintiffs*

▪ This court finds that each primary insurance carrier has an obligation to defend plaintiffs against third-party claims seeking damages for bodily injury or property damage arising from the dioxin-spraying, unless after discovery the insurer can demonstrate: (1) that its policy is negated by fraud or some other particular exclusion; or (2) that no part of the alleged bodily injury or property damage process could have occurred during that insurer's policy period.

▪ Generally, the duty to defend is independent of and broader than the duty to indemnify. *See, e.g., Trizec Properties v. Biltmore Const. Co.*, 767 F.2d 810, 811–12 (11th Cir.1985); *Burton v. State Farm Mut. Auto Ins. Co.*, 335 F.2d 317, 321 (5th Cir.1964). Even defendants admit that an insurer must defend claims that are potentially subject to coverage, meaning those cases in which the allegations of the complaint, if proven, would give rise to coverage.[11] Consequently, there is little conflict in state law on this issue and general principles of insurance law are highly persuasive. An insurer's duty of defense requires it to defend all cases against a policyholder until the carrier can demonstrate affirmatively that a particular plaintiff's underlying claim is totally outside the scope of its coverage. The fact that the underlying claims involve allegations of continuous injury does not change this result. Prior to determining which trigger mechanism to use, a court can still find that a defendant insurance company is liable to provide a defense. *Emons Indus., Inc. v. Liberty Mut. Fire Ins. Co.*, 481 F.Supp. 1022 (S.D.N.Y.1979).

▪ While there is a link between the duty to defend and the duty to indemnify, even in trigger-of-coverage cases,[12] defendants apparently take the position that if the scope of the policy's coverage is in dispute, that dispute must be resolved before the duty to defend can be resolved. As a general rule, a liability insurer has no duty to

---

11. *See, e.g., Salus Corp. v. Continental Cas. Co.*, 478 A.2d 1067, 1069–70 (D.C.1984); *Hicksville Motors v. Merchants Mut. Ins. Co.*, 97 A.D.2d 396, 467 N.Y.S.2d 220, 221 (Sup.Ct.), *aff'd*, 61 N.Y.2d 661, 472 N.Y.S.2d 88, 460 N.E.2d 229 (1983); *Lionel Freedman, Inc. v. Glens Falls Ins. Co.*, 27 N.Y.2d 364, 368, 318 N.Y.S.2d 303, 305, 267 N.E.2d 93, 95 (1971); *see also Prudential Lines, Inc. v. Firemen's Ins. Co.*, 91 A.D.2d 1, 457 N.Y.S.2d 272, 275 (Sup.Ct.1982).

12. *Eagle-Picher, supra* note 5, at 111. *Accord Insurance Co. of North Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1224–25 (6th Cir. 1980), *modified*, 657 F.2d 814, *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Keene, supra* note 6.

defend a suit brought by a third party where the complaint fails to bring the case within the coverage of the policy. 14 *Couch on Insurance*, § 51:45 (rev. ed. 1982). *Accord* 7C Appleman, *Insurance Law and Practice*, § 4682 at 25 (1979). Yet this court finds that the duty to defend is not and cannot be dependent on the defendants' ultimate obligation to indemnify plaintiffs. There is no reason why the insured, whose insurer is obligated by contract to defend him, should have to try the facts in a suit against his insurer in order to obtain a defense. *Travelers Indemnity Co. v. Dingwell*, 414 A.2d 220, 227 (Me. 1980). The whole point to the insurance coverage duty to defend is to afford insureds some security and peace of mind when suits such as these are brought. If the allegations of the underlying complaint assert facts which raise the possibility of recovery, however remote, the insurer has an obligation to defend. *Klein v. Salama*, 545 F.Supp. 175, 177 (E.D.N.Y.1982).

■ The link with the indemnification issue, then, is that the burden is on defendants to demonstrate that there is no possibility of recovery under their policy before they can be relieved of their defense obligation.[13] After reading the various defense clauses of the primary insurance carriers' policies, and reviewing the nature of the claims underlying the dioxin cases, this court concludes that a possibility of recovery for which these insurers would be liable does exist. As such, their duties to defend are triggered. For any given claim, if an insurance company can show that coverage fails because of some reason specific to that policy, that defendant can, after conducting any necessary discovery, file a motion for summary judgment in this court with regard to their duty to defend and indemnify. If coverage fails because of some reason specific to an underlying dioxin-related claim (e.g., the entire injury process fell completely outside the time the

insurance policy was in place), that defendant can pursue the matter in whichever court that claim is being brought.

Defendants point out that plaintiffs are currently receiving aid in preparing their defense for the dioxin-related claims. Most of plaintiffs primary carriers under the Interim Agreement are shouldering the burden of defense and therefore defendants assert that there is no need at this time to decide whether, in the end, defendants are actually obligated to do so.

■ This argument is unacceptable. Additional facts are not necessary to determine this issue. The simple fact that the underlying claims may be found outside the insurance coverage does not change the obligation to defend absent a showing that there is no possibility of recovery under the policies. Defendants have not met this burden. Further, as pointed out by plaintiffs, there are temporal limitations of the agreement: it may be terminated by defendants effective August 1, 1986. This court finds that since all of the underlying claims potentially trigger defendants' obligation to pay for those claims, they must be defended by the primary carrier defendants.

### III. *Defendants' Motion to Strike Terbrueggen Affidavit*

■ Part of plaintiffs' argument in their motion for partial summary judgment is based on the affidavit of Thomas J. Terbrueggen. *See* Plaintiffs' Motion for Partial Summary Judgment, Exhibits, Section D. Terbrueggen is the Director of Risk Management for plaintiff TCC. The five-page affidavit describes the underlying facts of the ownership of IPC, the circumstances of the Bliss disposal, the filing of the dioxin-related claims, and the request to defendants to pay for the cost of defending against these claims.

---

**13.** *Villa Charlotte Bronte, Inc. v. Commercial Union Ins. Co.*, 64 N.Y.2d 846, 487 N.Y.S.2d 314, 476 N.E.2d 640 (1985); *Servidone Constr. Corp. v. Security Ins. Co.*, 64 N.Y.2d 419, 488 N.Y.S.2d 139, 477 N.E.2d 441 (1985); *American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 764 n. 1 (2d Cir.1984); *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 486 N.Y.S.2d 873, 876, 476 N.E.2d 272, 275 (1984); *Sandoz, supra* note 6, at 267.

On September 16, 1985, defendants filed a motion to strike this affidavit pursuant to FRCP Rule 56(e). Defendants argue that the affidavit: (1) is not made on personal knowledge; (2) includes conclusory assertions of fact and law that would not be admissible in evidence; (3) does not show affirmatively that the affiant is competent to testify to the matters stated therein; (4) does not attach or thoroughly identify the papers to which it refers; and (5) misstates the contents of the documents to which it does refer. Defendants are concerned that Terbrueggen cannot have knowledge about events that preceded the start of his employment in 1977. Further, defendants object to the summarization of defendants' insurance policies and summarization of the underlying dioxin-related complaints without the attachment of the actual documents.

To avoid any concerns regarding the personal knowledge issue, plaintiffs responded by filing the affidavit of Gregory F. Browne, who was employed by IPC from 1964 to 1982, and was district manager of IPC's St. Louis district after 1970. A second Terbrueggen affidavit was also filed by plaintiffs to clarify the post–1977 events. Plaintiffs also argue that summaries of pertinent contents of voluminous records are completely satisfactory under Rule 1006 of the Federal Rules of Evidence. There is no need to overburden the courts with the files of the policies or complaints.

This court accepts the Terbrueggen affidavit as cured by plaintiffs' supplemental filings. Given the number of dioxin-related claims underlying this matter, the summaries submitted by plaintiffs are appropriate and adequate. As for the assertions made in plaintiffs' affidavits, this court simply accords any conclusionary statements of law the weight they deserve.

**14.** Pacific Policy No. CMP 31000–A, attached as Exhibit 4 to Pacific's Motion for Summary Judgment. This policy was in effect between Pacific and Signal from October 3, 1968 through October 3, 1971.

## IV. Defendant Pacific Indemnity Company's Motion for Summary Judgment and Plaintiffs' Cross-motion for Summary Judgment On the Same Issue of Whether Pacific Insured Plaintiff IPC

On August 16, 1985, defendant Pacific Indemnity Company ("Pacific") moved for summary judgment in its favor against plaintiffs. On September 16, 1985, plaintiffs responded with a cross-motion for summary judgment against Pacific. On October 17, 1985, Pacific replied regarding its motion and responded to plaintiffs' cross-motion. On November 4, 1985, plaintiffs replied regarding their cross-motion.

The basic issue at stake in these motions is whether, as a matter of law, Pacific insured plaintiffs after January 7, 1971, the date on which Pacific's insured, The Signal Companies, Inc. ("Signal"), sold IPC to plaintiff Charter, the subsidiary of TCC. If the insurance coverage given Signal fell away when IPC was sold, then Pacific provided no coverage for the dioxin-related claims, which arose six weeks after the sale. If the insurance coverage did carry over to plaintiffs, then Pacific is in the same position as all the other defendants since the policy did not run out until after the spraying occurred.

Pacific argues that the only coverage it provided for IPC was through a policy negotiated with Signal which covered many of Signal's subsidiaries.[14] IPC was among those subsidiaries covered. In 1970, Signal agreed to sell IPC to plaintiff Charter. In Article XXI of the Agreement and Plan of Reorganization,[15] the parties agreed that Signal would maintain insurance coverage on the assets being sold "pending the Closing Date." Charter could continue the coverage if it requested and reimbursed Signal for the Premiums for doing so. The sale occurred January 7, 1971.

**15.** This agreement appears as Exhibit No. 7 to Pacific's Statement of Material Facts as to Which There is No Genuine Issue.

Charter never sought assignment of the Pacific insurance policy and never made any payments for premiums to Pacific. Yet Charter did obtain an insurance Binder from defendant Travelers Insurance Company on October 13, 1970. On April 30, 1971, Travelers issued an endorsement naming IPC as an insured.

The first removal of waste materials containing dioxin occurred in February 1971. As Pacific sees it, plaintiffs did not want insurance coverage from Pacific, they did not need insurance coverage from Pacific, they did not pay for insurance coverage from Pacific, and they therefore are not entitled to insurance coverage from Pacific.

Plaintiffs respond that the literal language of the policy suggests that IPC was covered under the policy even after it was sold to Signal.[16] Plaintiffs interpret Item 6 of the policy as an independent list of covered companies from which IPC was not deleted during the policy period. Pacific should have cancelled the policy as to IPC pursuant to the Cancellation Clause. Yet no explicit cancellation exists. Other endorsements to the policy previously had added and deleted named insureds. *See* Pacific Exhibit 4. Further, plaintiffs argue that Charter and TCC are entitled to coverage as "insureds" as that term is defined in the policy.[17]

Further, Pacific argues that even if the policy did not fall away pursuant to the sale agreement, it does because the policy's consent to an assignment clause was never executed. General Condition A of the Pacific policy states that "assignment of this policy shall not be valid except by written consent of (Pacific)." Since Signal never made an assignment and Pacific never gave its consent, the insurance did not continue. *See* 16 *Couch on Insurance* 2d § 63:159–60 (rev. ed. 1983).

Plaintiffs argue that the sale of IPC did not involve an assignment within the meaning of the no-assignment clause. IPC's right to coverage was an asset of IPC which was not affected by the change in the ownership of IPC's capital stock. The transfer of this capital stock, therefore, was not an "assignment."

Pacific argues that such a theory is absurd because Pacific has no chance to bargain for the increased risk of insuring a subsidiary of Charter. The $1.5 million annual premium policy was only undertaken pursuant to an analysis of Signal and an assessment of the risk involved. Absent a valid consent to assignment clause, Pacific would not have the opportunity to analyze the degree and type of risk Pacific might be exposed to under a different owner. Before purchasing IPC, Charter did not have any sales, revenue or income from petroleum refining or marketing; it was a financial servicing and retailing outfit. It would be absurd to suggest that without an opportunity to conduct an investigation of a new policyholder, Pacific elected to insure a company that suddenly acquired $71 million work of oil and gas subsidiaries.

Plaintiffs contend that no alteration of insured-against risk in fact took place. After the sale of IPC, its business operations and management remained unchanged. IPC continued to conduct its petrochemical sales operations out of the same facilities. IPC's business practices, the number of employees, the location of operations, and the number of vehicles and pieces of equipment in operation did not change. Therefore, explicit consent to an assignment was

---

**16.** Under Item 1A of the Declarations to the policy, a "named insured":

> shall mean the Signal Companies, Inc. ... and the subsidiaries and associate companies of "The Signal Companies" or its subsidiaries and associate companies; *or other company but only as listed in ITEM 6 of the Declarations....*

(emphasis added). In Item 6, IPC was a named insured under the policy.

**17.** The policy provides coverage to "insureds," who are defined as follows:

> The unqualified word "Insured," wherever used in this policy, includes not only the "NAMED INSURED" as shown in the Declarations, but also:
>
> 1. Any ... stockholder ... of the "Named Insured" by reason of occupying such position while acting for and on behalf of the "Named Insured"....

not necessary, nor any investigation by Pacific.

This court finds that a written assignment of the policy was necessary for it to pass along with IPC as part of its "capital stock." Backed up by the clear intent of the policy, any time $71 million in assets changes ownership, especially to an owner unfamiliar with the business being sold, a material change in risk should be presumed. Further, without plaintiffs having paid any proportional premiums to Pacific, and given the language of the reorganization clause, it seems clear that neither Pacific nor Charter considered the Pacific insurance policy in effect after the sale of IPC, regardless of the fact that IPC was not deleted from Item 6 of the policy negotiated between Pacific and Signal. Since IPC is not an "insured", shareholders Charter and TCC are also not insured, for the same reasons and pursuant to the plain language of the policy.

## V. *Conclusion*

The following motions remain to be determined in this suit: plaintiffs' motion for partial summary judgment regarding the trigger-of-coverage, defendants' joint motion to compel production of documents, and defendant Hartford's motion to dismiss for abuse of discovery. Once briefings have been received on the choice of law matter discussed above, the court will take these additional motions under advisement.

An appropriate Order accompanies this Memorandum.

## ORDER

This matter comes before the court on plaintiffs' motion for partial summary judgment, defendants' motion to strike the affidavit of Thomas J. Terbrueggen, defendant Pacific Indemnity Company ("Pacific")'s motion for summary judgment, and plaintiffs' cross-motion for summary judgment against Pacific. Upon considerations of the motions, the oppositions there-

to, and the entire record herein, it is, by the court, this 4th day of February, 1986,

ORDERED that each defendant that sold plaintiffs primary liability insurance is obligated to pay for plaintiffs' full defense costs in each underlying dioxin-related case unless the defendant primary carrier can demonstrate upon motion: (1) that the policy has no effect because of some conduct on the part of plaintiffs (such as fraud) or some exclusion provision within the policy; or (2) that no part of the alleged bodily injury or property damage process could have occurred during that defendant's policy period; and it is further

ORDERED that no later than February 18, 1986, plaintiffs and each of the remaining four primary insurers shall submit briefings of no more than 20 pages in length on the issues of: (1) what state's substantive law governs the trigger-of-coverage issue raised in plaintiffs' motion for partial summary judgment; (2) which trigger-of-coverage that state would apply in this action; and (3) whether extrinsic evidence would be required by that state in construing defendants' insurance policies; and it is further

ORDERED that no later than February 25, 1986, plaintiffs and each of the remaining four primary insurers may respond to their opponents' February 18, 1986 filings with briefs of no more than 10 pages; and it is further

ORDERED that defendants' motion to strike the affidavit of Thomas J. Terbrueggen is denied; and it is further

ORDERED that defendant Pacific's motion for summary judgment dismissing Pacific from this case is granted and plaintiffs' cross-motion for summary judgment against Pacific is denied; and it is further

ORDERED that plaintiffs' motion to strike defendants' supplemental oppositions to the motion for partial summary judgment is denied.

## MEMORANDUM

On February 4, 1986, this court disposed of various motions pending in this case.[1]

1. *Independent Petrochemical Corp. v. Aetna Cas. & Surety Co.,* Mem. & Order (D.D.C. Feb. 4, 1986) (Flannery, J.). At that time, this court dismissed defendant Pacific Indemnity Compa-

The court requested supplemental briefings regarding choice-of-law prior to final determination of plaintiff's motion for partial summary judgment.[2] In response to this, all primary insurers[3] and some excess insurers[4] filed supplemental papers.

The court now considers most of the remaining motions pending in this case: (1) motion of primary carriers to reconsider the court's Order of February 4, 1986 respecting the duty to defend; (2) motion of The Continental Insurance Company to clarify the court's Order of February 4, 1986; (3) plaintiffs' motion for partial summary judgment; (4) motion of American Home Insurance Company and Lexington Insurance Company to amend their answer; (5) motion of Hartford Accident and Indemnity Company for dismissal, or in the alternative, to compel the production of documents and responses to interrogatories and sanctions; (6) motion of Aetna Casualty and Surety Company and Insurance Company of North America to compel production of documents; and (7) motion of Insurance Company of North America for a protective order.

Given the complexity of the issues here considered, and the hundreds of papers filed to date in this case, the underlying facts bear repeating. Each motion is then considered separately.

## I. *Background*

Plaintiff Independent Petrochemical Corporation ("IPC") is in the business of terminaling and marketing various petrochemical products in Missouri. IPC is a wholly-owned subsidiary of plaintiff Charter Oil Company ("Charter"), which in turn is owned by plaintiff The Charter Company ("TCC"). Plaintiffs have filed for Chapter 11 bankruptcy in Florida.

Defendants are 23 insurance companies that sold 66 primary and excess liability insurance policies to plaintiffs from 1971 to 1983, for which plaintiffs paid in excess of $10 million and which provide coverage of approximately $1.115 million for each "occurrence" of certain "bodily injury" and "property damage."

In 1971, IPC agreed to help one of its customers, Northeastern Pharmaceutical and Chemical Company ("NEPACCO"), to remove waste products from a holding tank at NEPACCO's facility in Verona, Missouri. IPC did this by contacting an independent contractor, Russell Martin Bliss, who removed over twenty thousand gallons of waste products. It is now alleged that this waste material contained a concentration of dioxin, a toxic element that can cause physical injury. Bliss allegedly mixed these waste products with waste oils he collected from other sources and sprayed the mixture as a dust suppressant at a number of sites in Missouri.

Fifty-seven civil actions involving more than 1,600 claimants have been filed in other courts against plaintiffs, as well as class actions and suits by Missouri and the United States.[5] Most of the claims allege

---

ny from this case and recognized a duty to defend plaintiffs by the remaining insurance carrier defendants.

**2.** Plaintiffs' motion for partial summary judgment, filed June 14, 1985, sought recognition by this court of defendants' duty to defend and duty to indemnify for tort claims filed against plaintiffs regarding the disposal of waste materials in Missouri.

**3.** The remaining primary insurance carriers are Aetna Casualty and Surety Company ("Aetna"), Continental Insurance Company ("Continental"), Insurance Company of North America

("INA"), The Travelers Indemnity Company ("Travelers"), and Hartford Accident and Indemnity Company ("Hartford").

**4.** The excess insurance carriers who requested and were permitted to file supplemental briefs on the choice-of-law issue were U.S. Fire Insurance Company ("U.S. Fire"), London defendants (which consist of numerous syndicates and companies), and American Employers' Insurance company and Employers Commercial Union Insurance Company.

**5.** These actions are mostly in pretrial stages and will be referred to throughout this Memorandum as "dioxin-related" claims.

bodily injury and property damage from exposure to the contaminated spray material. Many of the claims are "delayed-manifestation" claims, meaning that they allege continuous and progressive damage from the time of exposure to the time the injury became apparent. The individual claimants seek in aggregate $4 billion in bodily injuries and property damage, as well as $4 billion in punitive damages. Some of the claims have been settled.

Although the various insurance policies vary in minor ways, the relevant language from a representative policy[6] is as follows:

The "Coverage" provision states:

The company will pay on behalf of the insured all sums which the insured shall become legally obliged to pay as damages because of

bodily injury or property damage

to which this insurance applies, caused by an occurrence....

The term "occurrence" is defined as:

an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

"Bodily injury" is defined as:

bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

"Property damage" is defined as"

(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting there-

from, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The "defense" provision states:

the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent....

On June 14, 1985, plaintiffs filed their motion for partial summary judgment. On February 4, 1986, this court ordered that each defendant that sold plaintiffs primary insurance policies is obligated to pay for plaintiffs' full defense costs in each underlying dioxin-related case, unless the defendant primary carrier could show that coverage failed for certain reasons. Plaintiffs also sought a declaration of the primary and excess insurance carriers' obligations to indemnify plaintiffs for settlements and judgments, if any, in the dioxin-related claims. Rather than reach a decision concerning in what manner coverage should be triggered for purposes of indemnification, the court asked for supplemental briefings regarding the choice of law governing this issue.

Defendants oppose this court reaching a summary declaration on either the defense or indemnification issues on the grounds that there are genuine facts still in dispute regarding the dioxin-related claims. On the first round of briefings, this court allowed defendants to file jointly and individually briefings regarding plaintiffs' overall

---

**6.** The provisions in the text are taken from Aetna policy number 39 AL 219867 SCA. See Exhibit 1 to Affidavit of Thomas J. Terbrueggen for a list of which insurers' policies covered plaintiffs for each year 1971 to 1983. The pertinent policy provisions of the primary comprehensive general liability policies issued to plaintiff were filed September 20, 1985, as Attachment F (Defendants' Exhibit of Illustrative Policy Provisions) to their Joint Opposition to Plaintiffs' Motion for Partial Summary Judgment. Provisions regarding the excess policies appear in the same attachment.

The policy provisions at issue in this case are all variants of the Comprehensive General Lia-

bility Policy ("CGL"), a standard-form policy for liability coverage drafted during the 1960's by representatives of the insurance industry to deal with the problem of liability for injuries caused over a period of time. Instead of covering only "accidents", a word that connotes an event causing immediate or contemporaneous injury, the CGL was written to cover "occurrences", which includes exposure to conditions which result, during the policy period, in bodily injury. Unfortunately, what constitutes "bodily injury" is less than clear, thereby creating a basis for disputes as to the trigger of coverage.

motion. On the second round of briefings, both sides were asked to file papers indicating which state law applies to this action and how that state would handle the indemnification issue placed before this court by plaintiffs. As a preliminary matter, this court notes that plaintiff bears the burden of pleading their motion and this court must conclude that there are no material facts in dispute before relief may be granted plaintiff.

## II. *Motion of Primary Carriers for Reconsideration*

On February 4, 1986, this court granted in part plaintiffs' motion for partial summary judgment by ordering that:

each defendant that sold plaintiffs primary liability insurance is obligated to pay for plaintiffs' full defense costs in each underlying dioxin-related case unless the defendant primary carrier can demonstrate upon motion: (1) that the policy has no effect because of some conduct on the part of plaintiffs (such as fraud) or some exclusion provision within the policy; or (2) that no part of the alleged bodily injury or property damage process could have occurred during that defendant's policy period.

Order, at 1349.

The court reached this conclusion by noting that, unlike the issue of defendants' obligation to indemnify, the duty to defend question involved no significant conflict of laws among the potentially interested states. Further, the duty to defend is independent of and broader than the duty to indemnify. As a general matter, the duty to defend is based on the allegations of the underlying complaints filed against the insured and it arises where there is a possibility of coverage. After reviewing the defense clauses of the primary insurers as well as the allegations characteristic of the underlying dioxin-related cases, this court concluded that a possibility of recovery under the policies existed and therefore the duty to defend arose. The court instructed the carriers that the duty to defend could be disproved in one of two ways:

For any given claim, if an insurance company can show that coverage fails because of some reason specific to that policy, that defendant can, after conducting any necessary discovery, file a motion for summary judgment in this court with regard to their duty to defend and indemnify. If coverage fails because of some reason specific to an underlying dioxin-related claim (e.g., the entire injury process fell completely outside the time the insurance policy was in place), that defendant can pursue the matter in whichever court that claim is being brought.

Memorandum, at 1346.

The five primary carrier defendants now seek reconsideration of this mechanism for establishing their duty to defend. Defendants find two errors in the court's reasoning. First, defendants believe that plaintiffs have failed to carry their burden in showing that there are no factual disputes respecting (1) whether plaintiffs gave timely notice to defendants of the "occurrence" of injury in the underlying dioxin-related claims, and (2) whether plaintiffs made proper disclosure in procuring the insurance policies. If there are factual matters in dispute on these issues, plaintiffs are not entitled to partial summary judgment. Second, defendants argue that it is not enough to look at just the underlying dioxing-related complaints to show potential coverage giving rise to a duty to defend. Rather, the court must first determine that there has been timely notice and proper disclosure to the primary carriers before the duty to defend arises.

The effect of this court's Order was to require that each *defendant* bear the burden of showing sufficient facts on either issue—notice or disclosure—which would show that no duty to defend arises. In a sense, this was a provisional finding: the duty to defend was established until such time as any defendant could show that circumstances peculiar to its policies pre-

cluded recovery under those policies.[7] Rather than as a grant of partial summary judgment, the order is best characterized as a declaratory judgment of plaintiffs' right to a defense pending further developments.

Defendants argue that compliance with the notice provisions of the primary policies is a condition *precedent* to any duty to defend. *See, e.g., Swiss National Ins. Co. v. Martorella,* 239 So.2d 144, 145 (Fla.Dist. Ct.App.1970) (reversing trial judge's entry of summary judgment that insurer had duty to defend because of disputed facts on adequacy of notice). In other words, no duty to defend can be found until it is established by plaintiffs that notice was given in a timely manner. Further, to establish this on a summary judgment motion, plaintiffs must show that there are no genuine issues of fact regarding when and to what extent plaintiffs knew that the waste materials were sprayed. Defendants contend that there are too many unresolved facts to sustain such a motion. For instance, plaintiffs claim they were not aware until late 1982 that waste was sprayed on more than just two horse farms,[8] but various documents before the court suggest that plaintiffs may have known as early as September of 1974 that waste had been sprayed over streets and public places.[9] Defendants assert that absent further discovery establishing undisputed facts, it is for the factfinder to determine whether plaintiffs gave notice to defendants as soon as it was aware of potential injuries and that it disclosed all material facts when it procured policies of insurance.

■ Defendants argue persuasively and are supported by a smattering of state court decisions. The only federal court decision cited regarding notice as a condi-

tion precedent to finding a duty to defend, *McPherson v. St. Paul Fire & Marine Ins. Co.,* 350 F.2d 563, 566 (5th Cir.1965), involved a motion for summary judgment by the insurance company, which is exactly the method of resolving the notice and disclosure issues set up by this court. Many of these cases involve the rather obvious situation of an insured who failed to notify the insurer that a single suit had been filed against the insured; none of these cases concern complex litigation involving numerous insurance companies that have provided various insurance policies over many years, potentially covering scores of underlying suits. To require plaintiffs to proceed against 23 insurance companies showing to a factfinder that all facts are indisputable on these issues, would deny plaintiffs a defense for quite some time, certainly while the underlying dioxin-related cases are being pursued. This completely frustrates the purpose of the insurance policies. This court finds that on the facts before it, enough evidence has been shown to conclude as a prima facie matter that notice was timely given to the insurers and material facts were disclosed, let alone that defendants were not prejudiced.

After careful consideration, this court adheres to its initial determination. Though there are further facts regarding the issues of disclosure and notice which may show that plaintiffs are not entitled to a defense by one or more of the carriers, at this time the court cannot say that such facts preclude the relief granted to plaintiffs. It is not enough to raise the mere possibility that a factual dispute may exist; defendants must raise genuine issues of fact. *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982); *accord Exxon Corp. v. Federal Trade Commission,* 663 F.2d 120, 126–27 (D.C.Cir.

---

**7.** It should be noted that two defendants—INA and Hartford—have proceeded pursuant to this approach by filing motions for partial summary judgment with this court asserting that facts peculiar to their policies preclude any duty to defend or indemnify. Those two motions are not decided today.

**8.** *See* Plaintiffs' Statement of Points and Authorities in Reply to Defendants' Various Oppositions to Plaintiffs' Motion for Partial Summary Judgment, filed November 18, 1985, at 72–75.

**9.** *See Joint Opposition of Defendants to Plaintiffs' Motion for Partial Summary Judgment,* filed September 16, 1985, at 55–58.

1980). As discovery proceeds, each insurance company which can show that plaintiffs failed to disclose material facts when taking out the insurance, or that plaintiffs did not notify in a timely manner that an "occurrence" took place, is free to file a motion in this court for a declaration that their policies do not cover the dioxin-related claims. This will serve as an efficient method of considering the defenses of each insurance company; that is, how the established facts relate to the policies of each defendant when those policies were negotiated and in effect. If there are shown to be disputed facts, the matter can proceed to trial, where the burden is on defendants to prove such affirmative defenses. If it can be shown that any insurer paid defense costs when it should not have, then that insurer can seek indemnification from those insurers who are responsible for shouldering the defense burden, or from plaintiffs if no insurer is responsible for such defense. Defendants are correct that these defenses are analytically different from other defenses in that they may be resolved in this court without reference to the specifics in the underlying dioxin-related suits.

### III. *Motion of Continental Insurance Company to Clarify*

Defendant Continental Insurance Company raises a valid concern regarding the application to Continental of the court's Order of February 4, 1986. That Order, as noted above, obligates the primary insurers to provide a full defense at this time pursuant to the policies issued to plaintiffs. Recognition should have been made within the Order that Continental insured only plaintiff TCC, not plaintiffs Charter or IPC. Pursuant to this court's inherent authority to clarify an interlocutory order, Continental's motion is granted and its duty to defend and indemnify is recognized to extend only to claims against plaintiff TCC.

### IV. *Plaintiffs' Motion for Partial Summary Judgment*

The remaining issue in plaintiffs' motion for partial summary judgment seeks an order from this court that would allow two things. First, each insurer whose policy was in force at any time from a dioxin claimant's "first exposure or application" through the "last manifest development of bodily injury or property damage" would be required to pay in full for plaintiffs' liability, if any, for that claim. Second, plaintiffs would have the right to select which policy should indemnify and which policy should defend for any given dioxin-related claim, including the right to choose different policies for defense and indemnity on the same claim.

### A. *Resolving the "Trigger-of-Coverage" Question: Is it the Legal Duty of All Defendants to Indemnify Plaintiffs?*

Plaintiffs undoubtedly filed suit in this court in the hope of securing the same treatment used by this circuit in *Keene Corp. v. Insurance Co. of North Am.*, 667 F.2d 1034 (D.C.Cir.1981), *cert. denied*, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982). As noted above, the underlying dioxin-related claims are "delayed-manifestation" claims, meaning that a period of time has elapsed between the time of the exposure to the dioxin and the time the injury became apparent. Since different insurance companies may have insured for such injury over this period of time, the question arises of which "trigger-of-coverage" theory should be used.

Under an "exposure-only" theory, the only insurance policy triggered to cover a claim would be the one in place when the exposure occurred. If exposure took place over a time period in which many insurance companies provided coverage, liability might be assigned to an insurance company for the number of years it provided coverage. Under an "injury-in-fact" theory, the only insurance policy triggered to cover a claim would be the one in place when the exposure actually caused injury. Under a "manifestation-only" theory, the only insurance policy triggered to cover a claim would be the one in place at the time the injury becomes manifest.

Plaintiffs seek a declaratory judgment that the theory used in *Keene*—which shall be called the "multiple-trigger" theory—applies to this action. Under this theory, every policy in effect at any time during the injury process, from the initial exposure until the last manifest development of the injury, is triggered for coverage of any liability.

### 1. *The Choice of Law Problem*

■ In this court's Memorandum of February 4, 1986, it was determined that there was a conflict of laws among the potentially interested states on whether the *Keene* formulation is appropriate in this kind of case. Therefore, it was necessary to determine which potentially relevant jurisdiction has the "more substantial interest" in applying its local law.[10] The parties filed supplemental briefings discussing which state's law governs. Plaintiffs and many of the defendants believe that the law of the State of Florida governs this action. Other defendants argue in favor of applying California or New York local law. One defendant sees the laws of Ohio, Illinois, Missouri, Massachusetts, and Georgia as potentially applicable. After careful consideration of these arguments, this court finds that Missouri law applies to the trigger-of-coverage issue.

The leading case in this Circuit to date discussing choice of law in a case such as this is *Eli Lilly & Co. v. Home Ins. Co.*, 653 F.Supp. 1 (D.D.C.1984), *affirmed*, 764 F.2d 876 (D.C.Cir.1985). In that case, after an extensive choice of law analysis, this court found that Indiana law governed the action because Indiana had the more substantial interest in the interpretation and application of the various insurance policies. As this court stated:

Eli Lilly, the insured, is an Indiana corporation with its principal place of business in Indiana. Indiana was a principal site

of the negotiations and agreement on the terms of the coverage provisions and other pertinent provisions in these policies. More significantly, however, Eli Lilly and at least one of its insurers negotiated and preliminarily agreed that arbitration regarding any dispute over the interpretation of the policies would take place in Indianapolis, Indiana. Accordingly, it is the finding of this Court that Indiana law governs the interpretation of these insurance contracts.

*Eli Lilly*, at 7 (Johnson, J.). This conclusion was reached even though Pennsylvania and New York were also states where the parties negotiated and agreed on the terms of the insurance policies.

The contacts in this case are such that various states have some interest in the resolution of the choice of law issue. Most insurance policies were negotiated in Florida, California, Georgia, Louisiana, and Texas. Plaintiffs Charter and TCC are incorporated in and have their principal place of business in Florida. Yet plaintiff IPC is incorporated in Ohio and has its principal place of business in Missouri. Defendant INA only insured plaintiff Charter and all INA's policies were negotiated in Florida. Defendant Travelers' policies were negotiated and agreed upon in California by contracting with parties doing business in that state. Defendant U.S. Fire and certain London defendants hold policies in which there is an express provision calling for application of New York law. The execution and delivery of policies issued by defendant American Employers' Insurance Company and Employers Commercial Union Insurance Company implicate contacts with five states, all of which according to that defendant, are in accord on the trigger-of-coverage issue.

For a normal contract situation, five factors have been considered by this court: (1) the place of contracting; (2) the place of

---

**10.** Under the choice-of-law rules of the District of Columbia, the local law of the state which has the "more substantial interest" in the resolution of the issues must be applied to the case. *See Lee v. Flintkote Co.*, 593 F.2d 1275, 1279 n.

16 (D.C.Cir.1979); *Clayman v. Goodman Properties Inc.*, 518 F.2d 1026, 1030 n. 22 (D.C.Cir. 1973); *Fowler v. A & A Co.*, 262 A.2d 344 (D.C. 1970); *Stevens v. American Serv. Mut. Ins. Co.*, 234 A.2d 305, 309 (D.C.1967).

negotiation of the contract; (3) the place of performance of the contract; (4) the location of the subject matter of the contract; and (5) the place of the incorporation and the place of business of the parties. *Koro Co., Inc. v. Bristol-Myers Co.,* 568 F.Supp. 280, 286 (D.D.C.1983), *citing Restatement (2d) of Conflicts of Laws,* § 188 (1971) (hereinafter referred to as *"Restatement (2d)"*).

Application of these factors to this case presents considerable difficulties given the diverse nature of the parties and places of contracting. If Florida law were applied, certain defendants from other states who engaged primarily in insuring plaintiff IPC would be unfairly subjected to the law of a state not reasonably contemplated when the contract was created. Application of various state laws to various insurance contracts would be confusing, burdensome, unfair to plaintiffs if it creates significant gaps in coverage, and—in this court's view —unnecessary.

There are particular kinds of contracts which are given special attention because, in the absence of an effective choice of law by the parties, a particular contact plays an especially important role in the determination of the applicable state law. The trigger-of-coverage issue speaks to whether defendants are liable for indemnification to plaintiffs when injury or property damage is shown in the underlying dioxin-related suits. This issue is strongly connected with the location of the insured risk which the parties knew existed when the contracts were formed. While the location of two of the plaintiffs in Florida is significant, it is even more significant that all defendants knew that Florida plaintiffs were holding companies of plaintiff IPC and knew that IPC was engaged in terminaling and marketing various petrochemical products in Missouri. IPC was located in Missouri throughout the 1971–83 time period at issue in this suit and all of the activities giving rise to the underlying dioxin-related claims occurred in Missouri. It is not fortuitous for injuries to arise in Missouri from alleged improper waste disposal by IPC. Therefore, in the absence of specific choice of law provisions in defendants' insurance policies, this court finds that the law of Missouri governs the trigger-of-coverage question. *See Restatement (2d),* § 193 (the validity of liability insurance and the rights created thereby are determined by the law of the state which the parties understood to be the principal location of the insured risk).

This result promotes uniformity in situations where multiple insurers have insured parent corporations and their subsidiaries and extracted premiums based on the likelihood of liability arising from exposure of those subsidiaries. The parties, to the extent that they thought about the issue at all, must have expected that the local law of the state where the risk of exposure from IPC's activities is principally located (i.e. Missouri) would be applied to determine many of the issues arising under the insurance contract. Of course, given that all the injuries and property damage occurred in Missouri, and that the underlying dioxin-related claims are actively being pursued only in Missouri, Missouri has a natural interest in the determination of issues arising under the insurance contract.

Some defendants argue that due to Charter and TCC's many subsidiaries, especially in Florida, it was assumed that Florida law would apply for all their subsidiaries. Courts have noted, however, that for policies covering multiple risks, each risk may be treated as though it was insured by a separate policy, and the location of the risk at issue is deemed the principal risk for purposes of choice-of-law analysis. *Diamond Int'l Corp. v. Allstate Ins. Co.,* 712 F.2d 1498, 1501 (1st Cir.1983) (*quoting Consolidated Mut. Ins. Co. v. Radio Foods Corp.,* 108 N.H. 494, 497, 240 A.2d 47, 49 (1968)); *accord Grand Sheet Metal Prods. Co. v. Aetna Cas. & Sur. Co.,* 500 F.Supp. 904, 909 (D.Conn.1980). Defendants are all sophisticated insurance companies who assess risk and determine premiums by considering potential liabilities with discrimination, not by blind grouping of insured risks.

Plaintiffs can hardly object to application of Missouri law. An express condition of plaintiff Charter's Chapter 11 reorganization plan, as ordered by the Florida Bankruptcy Court, is that only IPC will be responsible for dioxin-related losses. This limits Charter's exposure in the underlying dioxin-related cases to the assets of IPC. Florida's interest is clearly minimal.

■■■ Effect should be given, however, to those contracts in which a choice-of-law provision specifically designates the state whose law controls interpretation of that contract. Plaintiffs were not in a weak bargaining position when such contracts were formulated. Rather plaintiffs are large, sophisticated corporations capable of understanding the meaning and effect of a contractual provision designating the insurer's choice of state law as governing the contract. For this reason, those insurance policies containing an express choice-of-law provision will be given effect by this court on the trigger-of-coverage issue in lieu of application of Missouri law, unless there is no reasonable basis for the selection of that state's law or there is a fundamental conflict between that state's policy and that of Missouri. *See Restatement (2d), § 187.* This apparently only applies to defendants U.S. Fire and certain London defendants' policies, which call for application of New York law. These defendants' selection of New York law, which is highly developed in the insurance field, is reasonable, and, as shown below, presents no fundamental conflict with the law of Missouri.

#### 2. *Missouri law and New York law*

Though not extensive, there is sufficient Missouri case law discussing which trigger-of-coverage is appropriate for delayed-manifestation injuries. In *Standard Asbestos Mfg. & Insulating Co. v. Royal Indemnity Ins. Co.,* CV80-14909 (Mo.Cir.Ct., Jackson County Apr. 3, 1986) (O'Leary, J.), the insured sought a declaratory judgment in favor of *Keene* insurance coverage for asbestos bodily injury claims. In construing the CGL policies, the court applied Missouri law and found that:

the policies require a showing of actual injury, sickness or disease occurring during the policy period based upon the facts proved in each particular case. This means that an occurrence of "personal injury, sickness, or disease," is determined to be at any point in time at which a finder of fact determines that exposure to asbestos fibers resulted in a diagnosable and compensable injury.... An exposure that does not result in injury during coverage does not satisfy the policy's terms. On the other hand, a real but undiscovered injury proved in retrospect to have existed at a relevant time, would establish coverage, irrespective of the time the injury became manifest.

*Id.,* at 17, 19. This holding is in accord with a much earlier decision by the Missouri Supreme Court. *Tomritz v. Employers' Liability Assur. Corp.,* 343 Mo. 321, 121 S.W.2d 745 (1938). In that case, the court said that if a jury concluded that silicosis injury actually happened during the policy period, then the insurance policy was triggered.

Therefore, this court does not interpret Missouri law as accepting the *Keene* doctrine, as urged by plaintiffs. Indeed, a Missouri federal court recently declined to accept any multiple trigger absent a more developed factual record. *Continental Ins. Cos. v. Northeastern Pharmaceutical & Chem. Co.,* No. 84–5034–CV–S–4 (W.D.Mo. June 25, 1985), *appeal docketed,* No. 85–1940–WM (8th Cir.1985).

Missouri appears to be in line with the current law on this issue in New York, as interpreted by the Second Circuit. *American Home Prod. v. Liberty Mut. Ins. Co.,* 565 F.Supp. 1485 (S.D.N.Y.1983), *aff'd as modified,* 748 F.2d 760 (2d Cir.1984) (an "occurrence" of personal injury means "any point in time at which a finder of fact determines that the effects of exposure to a drug actually resulted in a diagnosable and compensable injury").

Plaintiffs contend that subsequent New York state court decisions, such as *Servidone Constr. Corp. v. Security Ins. Co.,* 64 N.Y.2d 419, 488 N.Y.S.2d 139, 477

N.E.2d 441 (1985); *Autotronic Sys., Inc. v. Aetna Life & Cas. Co.*, 89 A.D.2d 401, 456 N.Y.S.2d 504 (3d Dept.1982); and *Schultheis v. Centennial Ins. Co.*, 108 Misc.2d 725, 438 N.Y.S.2d 687 (Sup.Ct.1981), override *American Home* and suggest application of a continuous trigger. This court finds nothing in these cases that limits the *American Home* analysis of trigger-of-coverage under New York law, and certainly no acceptance of the *Keene* multiple trigger doctrine. *Servidone* involved no delayed manifestation of injury. *Autotronic* accepted as triggering insurance coverage the exposure to toxic substances which aggravated existing injuries or caused additional injuries. *Schultheis* accepted as triggering insurance coverage the time when an act of medical malpractice was committed, not when its effects were discovered. Though there may not be a clear statement emerging from some of these lower state court opinions (*see, e.g., Allstate Ins. Co. v. Colonial Realty Co.*, 121 Misc.2d 640, 468 N.Y.S.2d 800 (N.Y.Sup.Ct. 1983) which cites *Keene* as using an "exposure" theory), this court remains convinced that the "injury in fact" theory announced in *American Home* correctly states New York law.

█ Consequently, this court finds that defendants' policies are such that defendants are liable to indemnify plaintiffs within the terms of defendants' policies for "occurrences" of injury defined as follows. At any time a finder of fact determines that the effects of exposure to dioxin negligently released by plaintiffs actually resulted in diagnosable and compensable injury to one of the underlying dioxin-related claimants, if a defendant's insurance policy was in effect at that time, then that defendant's and only that defendant's duty to indemnify plaintiffs for the underlying claim is triggered. Depending on the facts of each case, the chemical involved, the period and intensity of exposure, and the person affected, an injury may occur in this sense upon exposure, at some point in time after exposure but before manifestation of the injury, or at manifestation.

3. *The Existence of Genuine Issues of Fact*

Defendants argue that there are a number of genuine issues of material fact in issue which preclude summary judgment regarding defendants' obligation to indemnify plaintiffs. As defendants see it, whether there is coverage for such liability under any policy cannot be determined in the absence of specific information concerning the nature, origin, and timing of the damage or injury that served as the basis for the settlement or judgment.[11] Since plaintiffs have provided no such information, nor any proof material to numerous specific policy provisions, defendants seek discovery to develop various factual issues.

Plaintiffs argue and this court agrees that specific details of the underlying cases need not be developed prior to a ruling on plaintiffs' motion. Since they are irrelevant, such details cannot create genuine issues of material fact. When the underlying dioxin-related claims first arose, defendants had no problem declaring their trigger-of-coverage positions without engaging in extensive fact analysis. The facts defendants are concerned about address the question of ultimate liability for a particular claim, not which of defendants' policies may be called upon to cover a particular claim if the claim succeeds. This court's ruling provides a format for determining for each underlying dioxin-related claim what defendants' coverage obligations are.

This is in line with this court's *Owens-Illinois, Inc. v. Aetna Cas. & Surety Co.*, 597 F.Supp. 1515, 1526 (D.D.C.1984), appeal docketed, No. 85–5285 (Mar. 14, 1985). In that case, this court decided that no facts would come to light in an underlying claim

---

**11.** *Aetna Insurance Co. v. Waco Scaffold & Shoring Co.*, 370 So.2d 1149 (Fla.Dist.Ct.App.1978), cert. denied, 368 So.2d 1375 (Fla.1979); *American Motorists Insurance Co. v. Trane Co.*, 544 F.Supp. 669, 698 (W.D.Wis.1982), *aff'd*, 718 F.2d 842 (7th Cir.1983). *Accord Sherman v. Ambassador Ins. Co.*, 670 F.2d 251, 259–60 (D.C.Cir. 1981).

that would be relevant to the interpretation of the policy language at issue. The court simply looked to the language of the insurance policies, the fact that alleged injuries had developed after exposure to the policyholder's product, and the fact that the policyholder could be held liable for the injuries.

Defendants discuss different areas which they feel require more factual detail. For instance, various insurance policies cover "property damage" in the form of "physical injury to tangible property" and "nonphysical injury provided such loss of use is caused by an occurrence during the policy period." Finding that a loss fits this definition supposedly requires findings of fact wholly unripe for a summary judgment decision. Thus damages sought in the dioxin-related claims for diminished economic value may not fit this definition. Damages sought by Missouri or the United States for compensation in relocating individuals may not fit this definition. Damages based on harm to the economic activity of businesses in the area may not fit this definition.

■ Plaintiffs properly reply that the while such damages may be outside the provision defining property damages, other applicable provisions of the policies provide coverage for damages that plaintiffs must pay as a *result of* property damage. Thus, the policies require defendant to pay all sums that flow from the alleged property damage. Courts have held that sums denominated as "clean-up" costs constitute damages for purposes of liability insurance coverage. *See, e.g., Kutsher's Country Club Corp. v. Lincoln Insur. Co.,* 119 Misc.2d 889, 465 N.Y.S.2d 136, 139 (Sup.Ct. 1983); *Lansco, Inc. v. Department of Environmental Protection,* 138 N.J.Super. 275, 350 A.2d 520 (Ch.Div.1975), *aff'd,* 145 N.J.Super. 433, 368 A.2d 363 (1976), *cert. denied,* 73 N.J. 57, 372 A.2d 322 (1977). The claimants' alleged economic losses, if proven, also are covered as damages caused by alleged property damage. Economic loss and diminution of economic value is merely a measure of damages that result from the alleged property damage.

Defendants also contend that there are questions of fact concerning when the property damage took place. They believe the court must know when contaminants were introduced onto allegedly contaminated property, when and how they were spread, and when the contamination was discovered. What event might, as a legal matter, trigger coverage in a toxic waste case may be the subject of some controversy. Defendant INA especially contends that its primary policies do not employ the normal definition of occurrence and therefore raise a unique question of fact as to the trigger of INA policies with respect to dioxin claims.

■ Plaintiffs properly reply that all the policies cover an "accident" or "occurrence" of a type that includes "continuous or repeated exposure" to conditions. Regardless of any differences in wording such as pointed out by INA, the initial contamination need not happen during any particular policy period in order to trigger coverage. What is important, is whether the policy was in place at the time exposure to the dioxin caused injury in fact. Sufficient information is before the court that these defendants had policies in place during the time relevant for the dioxin-related claims.

■ Defendants next argue that evidence is needed as to whether the property damage is of a progressive kind. Evidence is also needed that plaintiffs' liability for health-related claims will be based on "bodily injury" that occurred during the coverage period. Defendants point out there is no clear indication what kind of diseases are at stake here and whether dioxin was the cause. There is no indication whether diseases caused by dioxin have long latency periods or are progressive in nature. Defendants submit the affidavit of Raymond D. Harbison to show that dioxin does not produce a continuous injurious process in humans.

Plaintiffs properly reply that they are not required to establish medical evidence proving a causal connection in the dioxin-

related cases that have been filed against them. Obviously, plaintiffs hope that no such causal connection exists, but believe that if it can be shown by the claimants in the underlying cases then defendants' policies must be triggered to cover any liability.

### 4. Limitations on this Court's Ruling

Defendants do raise three areas—pollution exclusion clauses, intent of plaintiff, and disclosure of material facts—which on a complete development of the facts might release an insured from its indemnity and defense obligations. These areas are discussed below and are not decided at this time since to do so would be premature. This court finds, however, that while these issues remain undecided, the question of which trigger applies to this case remains unaffected.

Defendants assert that various policies contain "pollution exclusion" clauses which state that bodily injury and property damage arising out of the discharge of toxic chemicals onto land is not covered unless accidental. Such clauses therefore exclude coverage for the situation this case presents, inasmuch as the discharge was not accidental. Pursuant to more findings of fact, a finding that plaintiffs' claims are precluded by these clauses obviates the need to address the trigger-of-coverage issue. Defendants believe additional discovery will show that plaintiffs knew they were not covered for this.

■ Plaintiffs reply: (1) that these pollution exclusion clauses only apply to active pollutors (meaning Bliss, the independent contractor, not IPC) [12]; (2) that the activity in question was not "pollution" within the meaning of the exclusion since the contamination was through commercial spraying, not industrial disposal [13]; and (3) that the discharge was "sudden and accidental" in that plaintiffs did not expect or intend the contaminating activity or the alleged injuries and damages to occur.[14]

■ In the dioxin-related complaints filed against plaintiffs, it is alleged that IPC was aware of the likely results of its acts in disposing of the waste materials. If this is correct, then there is no insurance coverage. The coverage only indemnifies for damage that was neither expected nor intended by plaintiffs. Defendants argue that such a factual issue precludes summary judgment. Plaintiffs must show that they did not expect or intend the bodily injury or property damage.

Plaintiffs again reply that the record clearly shows that plaintiffs neither intended nor expected the dioxin-related harm alleged in the underlying actions. IPC was not aware that the waste products contained dioxin or was toxic. Deposition of Gregory F. Browne, November 6, 1985, at 131, 137. Certainly IPC did not expect or intend the ultimate consequences for the alleged multitude of bodily injuries and property damage.

**12.** "Where the terms of an insurance policy are ambiguous or are subject to more than one reasonable construction, the policy must be construed most favorably to the insured and strictly against the insurer.... This is particularly so as to ambiguities found in an exclusionary clause." *Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603, 604 (4th Dept. 1980) (citations omitted). Where the policyholder is not actually engaged in the pollution-causing activity, the exclusion clause does not apply. *See, e.g., Van's Westlake,* 664 P.2d 1262, 1266; *Autotronic Sys.,* 456 N.Y.S.2d at 504; *Niagara County v. Utica Mutual Ins. Co.,* 80 A.D.2d 415, 439 N.Y.S.2d 538 (4th Dept.1981). IPC apparently did not generate or dispose of the waste material; it merely acted as an unfortunate intermediary in arranging for a hauler for the waste material generated by NEPACCO.

**13.** *Long Island Railroad Co. v. Commercial Union Ins. Co.,* [1982] Fire & Casualty Cas. [CCH] 14 (E.D.N.Y.1982) (policyholder engaged in weed spraying activities which caused chemical injuries could recover on policy despite exclusion clause).

**14.** "Sudden and accidental" can be equated with "neither expected nor intended." *See e.g., Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603 (Sup.Ct.1980); *Jackson Township Mun. Utilities Auth. v. Hartford Accident & Indemnity Co.,* 186 N.J.Super. 156, 451 A.2d 990 (1982); *United Pacific Ins. Co. v. Van's Westlake Union, Inc.,* 34 Wash.App. 708, 664 P.2d 1262 (1983).

As noted above regarding this court's decision on the duty to defend, defendants argue that some defendant insurers have affirmative defenses based on plaintiffs' failure to disclose facts about the potential for dioxin-related claims.

■ The court's response to these contentions is the same as it was with regard to the motion to reconsider the duty to defend ruling. Though there are further facts regarding the issues of disclosure and notice which may show that plaintiffs are not entitled to indemnification by one or more of the carriers, at this time the court cannot say that such facts preclude a declaration involving the appropriate trigger of coverage for any given claim. For any given claim, if an insurance company can show that coverage fails because of some reason specific to that policy, that defendant can, after conducting any necessary discovery, file a motion for summary judgment in this court with regard to their duty to defend and indemnify. If coverage fails because of some reason specific to an underlying dioxin-related claim (e.g., the entire injury process fell completely outside the time the insurance policy was in place), that defendant can pursue the matter in whichever court that claim is being brought.

### 5. The Relief Requested by Plaintiffs

Since the *Keene* multiple trigger is not to be applied in this case, certain matters of relief requested by plaintiffs are inappropriate. A multiple trigger will not be applied to property damage. Plaintiffs' ability to pick and choose amongst insurers over a continuous period is not in issue.

Defendants' challenge other aspects of the relief requested by plaintiffs. Defendants argue that they have no obligation to pay punitive damages on behalf of plaintiffs,[15] nor indemnify plaintiffs for the costs of complying with equitable remedies.[16]

■ Plaintiffs reply and this court agrees that the relief requested is entirely appropriate. When the insured itself is not personally at fault but is only liable vicariously for another's wrongdoing, insurance for punitive damages is permitted.[17] Public policy is not offended by covering any punitive damages imposed on plaintiffs since it appears that plaintiffs might be liable to the underlying claimants for the misfeasance of Bliss, not for any misconduct of their own. Of course, this depends in any particular case on whether the evidence warrants punitive damages. Yet at this point the court is unwilling to throw out plaintiffs' request for such coverage.

There are limits of recovery under the policies. Defendants argue that summary judgment should not be granted to plaintiffs since it would provide sweeping coverage for claims when the coverage is only for a certain amount. Plaintiffs reply that they are simply seeking coverage to the full extent of defendants per-occurrence limits of liability. Defendant Lloyds asserts that the defendants' policy limits cannot be "stacked" to cover "all dioxin-related damages." Plaintiffs reply and this court agrees that any stacking mechanism need not be determined at this time.

---

**15.** Many jurisdictions hold that insurance policies do not, as a matter of public policy or contract construction, cover punitive damages. See Annotation, *Liability Insurance As Extending To Liability for Punitive Or Exemplary Damages,* 16 A.L.R. 4th 11 (1982). Typically, it is held that permitting a wrongdoer to be reimbursed by an insurance company for punitive damages would undercut the punitive and deterrent purpose of this type of award and thus contravene public policy. *See, e.g., U.S. Concrete Pipe Co. v. Bould,* 437 So.2d 1061, 1064 (Fla.1983); *Crull v. Gleb,* 382 S.W.2d 17, 23 (Mo.Ct.App.1964). For Missouri state court interpretation of policies such as those in this case, *see Schnuck Markets,*

*Inc. v. Transamerica Ins. Co.,* 652 S.W.2d 206, 208 (Mo.Ct.App.1983).

**16.** Judgments not framed in the form of "damages" are not covered by defendants' policies under some state's laws. For Florida, *see Aetna Cas. & Surety Co. v. Hanna,* 224 F.2d 499 (5th Cir.1955).

**17.** *See, e.g., Ohio Ins. Co. v. Welfare Finance Co.,* 75 F.2d 58, 60 (8th Cir.1934); *Schwab v. First Appalachian Ins. Co.,* 58 F.R.D. 615, 622 (S.D. Fla.1973).

### V. *Motion of American Home Insurance Company to Amend*

■ Defendants American Home Insurance Company of the State of Pennsylvania and the Lexington Insurance Company move this court pursuant to FRCP Rule 15(a) for leave to amend their answer to plaintiffs' first amended complaint. Defendants seek to add three affirmative defenses regarding: (1) plaintiffs' breach of warranties, mistake, misrepresentation or omission of material facts in application for insurance and in other dealings with respect to the spraying of the waste materials; (2) plaintiffs' failure to take appropriate remedial action upon discovering the cause of the dioxin-related injuries and property damage; and (3) the non-coverage of plaintiff Charter under certain policies due to omission of Charter as a named insured.

Plaintiffs oppose the addition of these defenses for two reasons. First, plaintiffs contend that the defense of misrepresentation, mistake, or omission of material facts must be pleaded with much greater specificity, giving the specific circumstances and facts applicable to each individual defendant which constitutes mistake, misrepresentation, or omission of material facts. Second, plaintiffs contend that none of the proposed defenses are specific enough to enable plaintiffs to ascertain which defendant and which plaintiff these proposed defenses supposedly involve. Plaintiffs cite the requirements of particularity as set out in FRCP Rule 9(b) as well as various cases as support for denying the motion.

As defendants point out, plaintiffs only support in case law for the proposition that Rule 9(b) applies to *defenses* in the same manner as it does to allegations found in a complaint is a patent case concerning the defense of fraud decided by the District Court of Illinois. *Northern Engineering & Plastics Corp. v. Blackhawk Molding Co.*, 205 U.S.P.Q. 609 (D.Ill.1977). The purposes of Rule 9(b) are to provide a respondent with fair notice of a claim or defense and to ensure that it is based on a reasonable belief that a wrong has been committed. Determining whether these purposes are fulfilled is a matter largely within the discretion of this court. Plaintiffs have been aware of various misrepresentation, mistake, and non-disclosure defenses asserted by many of the defendants for some time. Indeed, at least ten defendants have pleaded substantially identical affirmative defenses as those proposed here without differentiating among plaintiffs and without any objection by plaintiffs as to their specificity. The posture of this case makes the defense of misrepresentation fairly clear: defendants believe that plaintiffs did not provide information about the dioxin spraying at the time the insurance policies were secured. This is not a complicated fraud case where the players and tactics cannot be identified absent detailed allegations. Further, the specifics of how much and when plaintiffs knew about the spraying and injuries are matters peculiarly within the control of plaintiffs. Specifics, especially those showing a pattern of omissions or failure to disclose, can develop more fully with discovery. Inasmuch as the thrust of this court's holdings today force defendants to show by motion that they are not required to defend or indemnify plaintiffs because of some misrepresentation by plaintiffs, it would be unfair to preclude defendants from asserting such a defense due to lack of information.

### VI. *Motion of Hartford for Dismissal or to Compel*

On December 12, 1985, defendant Hartford filed a motion for dismissal of plaintiffs' case for abuse of discovery. Alternatively, Hartford sought to compel production of documents and responses to interrogatories, and for sanctions.

On February 10, 1986, Hartford and plaintiffs entered into a court-approved stipulation regarding Hartford's motion. The parties agreed that plaintiffs would supplement their responses to Hartford's first Set of Interrogatories and that briefing regarding disputes as to those respons-

es would be deferred.[18] Consequently, the court does not at this time address Hartford's concern with plaintiffs' answers to interrogatories. The parties also agreed to pursue briefings regarding destruction of certain documents and plaintiffs' assertions of privilege regarding two documents. It is these matters which concern the court today.

## A. Destruction of Documents

Hartford contends that the discovery that has taken place to date has been marked by a consistent pattern of obstructive and dilatory practices by plaintiffs. Central to this has been the destruction of various documents which may be relevant to Hartford's discovery efforts.

Through the deposition of Thomas Terbrueggen on July 17, 1985, Hartford learned that plaintiff Charter had no document retention policy and that numerous documents held by Charter have been destroyed by Charter employees since this action was initiated. For instance, Terbrueggen himself had directed the disposal of 37 notebooks of insurance-related documents two weeks before his first deposition took place. The empty notebook binders were presented to Hartford at the second Terbrueggen deposition. Terbrueggen asserted that he only destroyed documents that he believed were duplicated in other files, but he was unable to describe in any depth the contents of the documents, nor whether they contained handwritten notations not found on their duplicates. Terbrueggen stated that the notebooks contained "a lot of proposals that different people had made to us over the years on insurance programs that we may or may not have purchased." Deposition of Thomas Terbrueggen, July 19, 1985, at 133. Hartford believes that such documents are of critical importance since they may provide insight into Charter's intent and understanding of insurance policy terms

that Charter agreed to over the past 15 years.

Hartford believes that Charter's obligation to preserve potentially relevant documents, see Struthers Patent Corp. v. Nestle Co., Inc., 558 F.Supp. 747 (D.N.J. 1981), arose when the dioxin claims against plaintiffs were filed over a decade ago. As Hartford sees it, continuous destruction of documents in the Risk Management Department since that time was clearly a violation of Charter's obligation. Since reconstruction of the documents is not possible, Hartford's ability to receive a fair trial is lost, and dismissal of the case is appropriate.

Plaintiffs respond that the notebooks in question contained old and useless documents which Terbrueggen, after review, determined were irrelevant to this litigation. Approximately 20 notebooks were retained as being possibly relevant. Those that were disposed of were extra copies, not originals. Deposition of Thomas Terbrueggen, July 19, 1985, at 133–39, 154. These notebooks dealt with subjects such as personnel practices, OSHA regulations, operating plans, seminar materials, and old proposals for insurance, including property insurance. Id., at 290, 296, 299, and 303–04. Hartford has not shown willful misconduct, nor that its defense has in fact been prejudiced.

Plaintiffs contend that dismissal of this case under FRCP Rule 37 is appropriate only when a party fails to obey a court order to provide discovery. Since plaintiffs have not done this, dismissal is inappropriate absent repeated violations of a court order or a proven record of bad faith. Hartford responds that this court has inherent equitable power beyond the confines of Rule 37 to dismiss this case. See United States v. Moss-American, Inc., 78 F.R.D. 214 (E.D.Wis.1978).

---

**18.** Upon supplementation of answers to Hartford's interrogatories, plaintiffs apparently have not satisfied Hartford. Hartford therefore asked this court on April 21, 1986 for leave to supplement its motion to compel. This court now grants that request and will give time for plaintiffs to file a response. This remaining discovery dispute and all future discovery disputes will be handled by the Magistrate.

While this court may have such power, this court declines to exercise it in this case. There is no question that when relevant documents are willfully destroyed by a party then that party is culpable and should be held responsible for the prejudice it has caused. *Wm. T. Thompson Co. v. General Nutrition Corp.*, 593 F.Supp. 1443 (C.D.Cal.1984). Hartford, however, has engaged in an insufficient showing that any relevant documents were in fact destroyed and that duplicates do not exist. Further, non-retention of such relevant documents must be a willful act, meaning deliberate obstructionist behavior. *See Societe Internationale v. Rogers*, 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958). Terbrueggen's depositions make it clear that he sought to retain all potentially relevant documents and to destroy only documents duplicated elsewhere. Certainly there has been no violation of a court order and no clear intent to hinder Hartford's interests. Though it may be difficult for Hartford to make a stronger showing given that these are documents in Charter's control, this court is reluctant to engage in the extreme sanction of dismissal based on pure speculation by Hartford. This court, however, advises Charter that all additional documents that relate in any way to this case, duplicative or not, should be stored not destroyed, pending the outcome of this litigation.

## B. *Documents Subject to Privilege or Work Product*

The primary person at IPC with knowledge of the events leading up to the dioxin contamination is Gregory F. Browne, the district manager of IPC's St Louis office. His knowledge may be critical in assessing whether IPC gave timely notice of the potential risk to the insurers and whether it disclosed the information it possessed about the dioxin claims to potential insurers.

Hartford seeks to compel production by plaintiffs of two documents—a transcript of a telephone conversation and a memorandum—relating to contacts between Browne and Kirk Baker, in-house counsel

of a Charter subsidiary, Charter International Oil Company.

Plaintiffs believe both documents are protected as privileged attorney-client communications and as attorney work product. As plaintiffs see it, the transcript is of a telephone conversation and reflects Browne's effort to obtain legal advice from Baker with respect to potential claims arising from Russell Bliss's spraying activities. The memorandum was sent by Browne to Baker following the telephone conversation and was a written report of the Bliss incident.

Determining whether communications made between corporate employees and a corporation's counsel are privileged requires application of the guidelines set out in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) and *Diversified Indus. Inc. v. Meredith*, 572 F.2d 596 (8th Cir.1977), *en banc hearing*, 572 F.2d 606 (8th Cir.1978). The privilege exists to protect the giving of legal advice by a corporation's lawyer to those in a position to control (or to take a substantial part in control of) decisions about corporate matters which require legal advice. These people, usually directors or high-ranking officers, are the "control group." Information given by lower-level employees is also protected where such employees are directed to communicate with the corporation's lawyer to enable him to give the corporation sound and informed advice. *Upjohn*, 449 U.S. at 394, 101 S.Ct. at 685; 449 U.S. at 403, 101 S.Ct. at 689 (Burger, J. concurring); *Diversified*, 572 F.2d at 609.

Gregory Browne, as just one of IPC's district managers, was not within the "control group" of the corporation: he played no role in how the corporation legally handled the dioxin incidents, *see* Deposition of Gregory F. Browne, November 7, 1985, at 349–50, and cannot be said to personify the corporation. Further, plaintiffs have failed to show that Browne was directed by corporate superiors to communicate with Baker so that Baker could pro-

vide legal advice to the corporation. Browne said that he did not recall anyone asking him to prepare the report. *Id.,* at 316, 320. Unlike in *Upjohn,* plaintiffs have also not shown that Browne was seeking legal advice or that he regarded the material to be of a confidential, legal nature. *See generally id.,* at 320, 324–25. The burden is on plaintiffs to prove conclusively each element of the privilege. *S.E.C. v. Gulf & Western Indus. Inc.,* 518 F.Supp. 675, 682 (D.D.C.1981). Without showing that such communications are a part of the control group's effort to secure legal advice, every memorandum and conversation between a corporate employee and corporate counsel could be confidential, which would expand the privilege far beyond its bounds and unnecessarily frustrate the efforts of others to discover corporate activity. Therefore, this court finds that these two documents are not privileged and orders their immediate release to defendants.

### VII. *Motion of Aetna and INA to Compel*

On February 10, 1985, defendants Aetna and INA filed a motion to compel plaintiffs to produce approximately 150 documents currently withheld by plaintiffs on the basis of the attorney-client privilege. The documents, listed in defendants' Attachment 1 to their motion, were generated from 1974 to 1982 and were prepared, compiled or received by plaintiffs' attorneys in connection with the defense of the underlying cases against plaintiffs. Defendants believe the documents are critical to the issues of adequate notice and disclosure by plaintiffs to their insurers.

██ Defendants assert that regardless of whether these documents are privileged for some purposes, they are not privileged as between plaintiffs and their insurers under the "common interest" doctrine. Under that doctrine, communications between an insured and its attorney connected with the defense of underlying litigation are normally not privileged vis-a-vis the insured's carriers in subsequent litigation. *See, e.g., Eureka Investment Corp. v. Chi-cago Title Ins. Co.,* 743 F.2d 932, 936–37 (D.C.Cir.1984); *Car & General Ins. Corp. v. Goldstein,* 179 F.Supp. 888, 890–91 (S.D.N.Y.1959), *aff'd,* 277 F.2d 162 (2d Cir.1960); *Truck Ins. Exchange v. St. Paul Fire & Marine Ins. Co.,* 66 F.R.D. 129, 133–36 (E.D.Pa.1975); *Southeastern Pennsylvania Transp. Auth. v. Transit Cas. Co.,* 55 F.R.D. 553, 557 (E.D.Pa.1972).

██ The crux of this dispute is whether the "common interest" doctrine trumps plaintiffs' claims of privilege where there is admittedly a common interest between the insurers and insureds in minimizing exposure in the underlying dioxin-related claims, but where there is also sharp dispute between insurers and insureds regarding insurance coverage. Defendants agree that plaintiffs are not obligated to disclose privileged communications directed specifically to the coverage questions at issue in this court. Rather, defendants seek documents related to plaintiffs' defense of the underlying dioxin-related claims. Plaintiffs contend that due to the dispute over coverage, there is no longer any common interest between insurer and insured, and privileged documents generated in the underlying litigation several years before need not be provided to the carriers.

This court disagrees with plaintiffs. There is no common interest between plaintiffs and defendants regarding communications made in anticipation of a dispute between plaintiffs and defendants. *See generally Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 743 F.2d 932 (1984). It is essential, however, to recognize that defendants are obligated at this time to defend plaintiffs in the underlying dioxin-related cases. To do this, access to documents prepared in anticipation of those claims are essential, and while those documents may be privileged from discovery by party opponents in the underlying claims, they cannot be privileged from carriers obligated to shoulder the burden of defending against those claims. There is no showing by plaintiffs that plaintiffs generated the documents expecting that they would be concealed from their insurance carriers. The documents

were generated in anticipation of minimizing something of common interest to both parties in this suit: exposure to liability from tort claimants. In short, plaintiffs had no reasonable expectations of confidentiality with regard to these documents.

Consequently, plaintiffs may not withhold those documents designated in defendants' Attachment A unless they were prepared in anticipation of the issues under consideration by this court. Though some matters within these documents may be highly probative of the issues before the court, this court declines to set a *per se* rule that a coverage dispute wipes out an insurer's ability to receive documents necessary in defending the underlying claims.

### VIII. *INA Motion for a Protective Order*

■ On March 26, 1986, defendant INA filed a motion for a protective order and a scheduling order. INA had previously filed a motion for partial summary judgment against plaintiffs. Instead of responding, plaintiffs moved for an extension of time in order to serve on INA a FRCP Rule 30(b)(6) request. This court granted plaintiffs until April 14, 1986, to respond to INA's motion but held in abeyance INA's motion for a protective order.

Though plaintiffs may be at fault for not pursuing such discovery with greater speed, there is no significant prejudice to INA in responding to such a discovery request. Once they do, plaintiffs can fully develop their response to INA's motion. These are difficult issues and the sooner necessary discovery is adequately completed, the sooner they may be resolved. Therefore, INA's motion will be denied.

### IX. *Conclusion*

Due to the outcome of today's Memorandum, those defendants with pending motions for partial summary judgment may wish to amend them to incorporate matters such as the impact of Missouri law. In anticipation of this, the court will provide a reasonable time for such amendment and the filing of oppositions.

An appropriate Order accompanies this Memorandum.

### ORDER AND DECLARATION

This matter comes before the court on various motions. Upon consideration of the movants' papers, the oppositions thereto, and the entire record herein, it is, by the court, this 2nd day of May, 1986

ORDERED that the motion of the primary carrier defendants for reconsideration of the court's Order of February 4, 1986 is denied; and it is further

ORDERED that Continental Insurance Company ("Continental")'s motion for clarification is granted to the extent that within the terms of this court's findings, any obligation of defendant Continental is to defend and indemnify only plaintiff The Charter Company; and it is further

ORDERED that Missouri law is determinative of the issues in this case; and it is further

ORDERED that plaintiffs' motion for partial summary judgment with regard to defendants' obligation to indemnify pursuant to a "multiple-trigger" theory is denied; and it is further

DECLARED that pursuant to this court's choice of law determination, if a finder of fact determines that at some time the effects of exposure to dioxin negligently released by plaintiffs actually resulted in diagnosable and compensable injury in fact to one of the underlying dioxin-related claimants, and if a defendant insurance carrier had a policy in effect at that time, then that defendant's duty to indemnify plaintiffs for the underlying claim is triggered; and it is further

DECLARED that notwithstanding defendants' duty to indemnify, any defendant primary insurance carrier is not obligated to indemnify plaintiffs if it can demonstrate upon motion that its insurance policy does not apply to the underlying dioxin-related claims because of some conduct on the part of plaintiffs (such as fraud or lack of notice) or some exclusion provision within the policy; and it is further

ORDERED that the motion of defendants American Home Insurance Company and Lexington Insurance Company to amend their answer is granted; and it is further

ORDERED that defendant Hartford Accident and Indemnity ("Hartford")'s motion to dismiss is denied; and it is further

ORDERED that defendant Hartford's motion to compel the production of two documents is granted; and it is further

ORDERED that defendant Hartford's motion to file a supplemental memorandum with regard to the inadequacy of plaintiffs' interrogatory responses is granted; and it is further

ORDERED that plaintiffs may respond to defendant Hartford's supplemental memorandum no later than May 12, 1986; and it is further

ORDERED that the discovery dispute regarding interrogatories between defendant Hartford and plaintiffs as well as all future discovery disputes are referred to the Magistrate; and it is further

ORDERED that defendants Aetna Casualty and Surety Company and Insurance Company of North America ("INA")'s motion to compel the production of documents is granted; and it is further

ORDERED that defendant INA's motion for a protective order is denied; and it is further

ORDERED that INA respond to plaintiffs' Rule 30(b)(6) request no later than May 12, 1986; and it is further

ORDERED that defendants Hartford and INA may file an amended motion for partial summary judgment in light of today's ruling no later than May 19, 1986; and it is further

ORDERED that plaintiffs may respond to defendants' motions for partial summary judgment no later than May 30, 1986; and it is further

ORDERED that defendants Hartford and INA may reply no later than June 6, 1986; and it is further

ORDERED that counsel appear for a status conference on May 12, 1986 at 10 a.m. to discuss any concerns of the parties in proceeding with this matter.