Royal Indem. Co. v Salomon Smith Barney, Inc. (2004 NY Slip Op 50739(U))

[*1]

Royal Indem. Co. v Salomon Smith Barney, Inc.

2004 NY Slip Op 50739(U)

Decided on June 29, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 29, 2004

Supreme Court, New York County
ROYAL INDEMNITY COMPANY, ROYAL INSURANCE COMPANY OF AMERICA and WESTCHESTER FIRE INSURANCE COMPANY, Plaintiffs,
against
SALOMON SMITH BARNEY, INC., as the successor in interest to Smith Barney, Inc., SALOMON SMITH BARNEY HOLDINGS, INC., and CITIGROUP, INC., as the successor in interest to The Travelers, Inc., as the successor in interest to Primerica Corp., Defendants.
125889/99

Shirley Werner Kornreich, J.
[Edited for publication]
I. FACTUAL AND PROCEDURAL BACKGROUND:
In this action, plaintiffs Royal Indemnity Co., Royal Insurance Co. of America and Westchester Fire Insurance Co. (collectively, "the plaintiffs," "the insurers" or "Royal") seek a declaration that they are not obligated to provide coverage under certain excess liability insurance policies to one or more of Smith Barney, Inc. ("Smith Barney"), The Travelers Group, Inc., The Travelers, Inc. and Primerica Corp. (collectively, "the defendants," "the insureds," "SSB" or "the Citigroup defendants") relative to claims arising from the settlement of two gender discrimination/sexual harassment class actions brought against defendants by 1920 female employees.[FN1] Plaintiffs' defenses to coverage are: (1) that they did not receive timely notice of the [*2]claims, as required by the terms of the policies; (2) that the insureds have not shown that the underlying insurance was properly and fully exhausted [FN2]; and (3) that the underlying claims either are not within the coverage provisions of the policies or else are excluded from coverage. The sole question at issue on this application is what discovery should be made available by defendants to plaintiffs relative to the latter's claim that notice was untimely. It is plaintiffs' position that defendants were aware at least eleven months before calling upon plaintiffs' excess policies that a resolution of the underlying gender-discrimination claims would exceed their primary coverage. Defendants, on the other hand, insist that they did not become aware of the magnitude of the class action plaintiffs' claims until late January or February 1997, such that their notice to Royal in late March 1997 was timely.
A. Facts:
Between 1989 and 1997, plaintiffs issued to defendants a number of excess liability insurance policies ("the Excess Policies") which allegedly covered, inter alia, any gender-based employment discrimination claims that might be asserted against their insureds.
On May 20, 1996, Pamela Martens and three other female employees of Smith Barney and/or of Shearson Lehman Brothers ("Shearson")[FN3] commenced a "class action" in the United States District Court for the Southern District of New York against Smith Barney, alleging an assortment of gender-based employment claims ranging from sexual harassment, gender discrimination, disparate treatment and retaliation (Martens v. Smith Barney et al., hereinafter "Martens"). Thereafter, on October 28, 1996, an additional six female employees of Smith Barney and/or Shearson filed a similar class action in the United States District Court for the Northern District of California, entitled Alvarez v. Smith Barney et al. ("Alvarez"). At about the same time, a second amended complaint was served in Martens adding nineteen new plaintiffs to the action. Both lawsuits sought restitution, past and prospective compensatory damages for lost wages and benefits, punitive damages, attorney's fees and other related damages on behalf of all plaintiffs. Neither specified a monetary figure.
The insureds allege that they first learned of the magnitude of the amounts demanded in the Alvarez and Martens litigations (collectively, "the class actions") in late January or February of 1997. Plaintiffs, on the other hand, contend that the insureds were aware that the class actions [*3]would be seeking "millions" even before the first complaint was filed in May of 1996, inter alia because the insureds held pre-suit settlement discussions with counsel for the class action plaintiffs. In either event, the insureds sent the first notice to plaintiffs regarding possible implication of their excess coverage on March 25th or March 26th, 1997. Plaintiffs allege that they received this notice on April 3, 1997. Plaintiffs further contend that the insureds and/or Citigroup retained counsel to represent SSB in the Martens action some time between the filing of the Martens lawsuit and the initial April 3, 1997 notification to plaintiffs. SSB was represented in both class actions by the firm of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), as well as, to an unspecified degree, by in-house counsel. In this action, SSB is represented by Skadden, Arps, Slate Meagher & Flom ("Skadden, Arps").
On June 26, August 12 and August 15, 1997, plaintiffs attended meetings with other insurers and the insureds regarding possible settlement of the class actions. On August 15, 1997, the insureds demanded that plaintiffs provide coverage for the class actions. On or about September 10, 1997, plaintiffs sent a letter to the insureds in which they (1) disclaimed coverage on the ground that the insureds had provided plaintiffs with untimely notice; and (2) reserved their rights to assert any and all available defenses.
On November 18, 1997, the insureds and the class action plaintiffs reached a settlement agreement which was approved by the United States District Court for the Southern District of New York on July 24, 1998. The settlement established a "Dispute Resolution Process" ("DRP"), consisting of mediation followed by binding arbitration, in which the claims of the (now) 1920 class members would be individually resolved. The settlement did not otherwise adjudicate the class members' claims or establish any limitation to the fund out of which they could be compensated. As of October 22, 2003, 1851 of the 1920 cases had been settled; six claims had gone to arbitration; and 69 claims remained open. See Exhibit D to Leonard Reply Affirmation.
B. Procedural History:
1. Background of the instant discovery dispute:
Plaintiffs commenced the instant declaratory judgment action on or around December 30, 1999.
In their efforts to ascertain when defendants became aware that the underlying class action claims were so large as to implicate their "excess" coverage, plaintiffs called for discovery concerning, inter alia, settlement demands by and discussions held with the class action plaintiffs, both before and after the class actions were filed. See, e.g., plaintiffs' Notice for Discovery and Inspection dated June 9, 2000, appended to plaintiffs' motion papers as Exhibit I, no. 24. In response, SSB refused to produce any such discovery, invoking in their responses to plaintiffs' discovery demands the attorney-client privilege, the work product doctrine, the joint-defense privilege, and "any other applicable privilege or immunity." See Exhibit J, no. 24. Defendants also objected to producing the requested evidence because "such materials constitute confidential settlement discussions not subject to disclosure." Id. SSB raised similar "blanket" objections to plaintiffs' interrogatories requesting a description of all communications with the class and/or its representatives concerning settlement, both pre- and post-filing of the class actions. In support of their refusal to describe any such communications, defendants cited, inter alia, the attorney-client privilege, the work product doctrine, and settlement-confidentiality. See [*4]plaintiffs' Exhibit K, nos. 1, 2, 3, 7, 8, 12, 26, 27, 28.
By letter dated December 8, 2000, plaintiffs demanded that SSB provide a "privilege log," identifying all documents being withheld from production on the basis of any asserted privilege. See plaintiffs' Exhibit L. Following telephone conferences and further correspondence, by letter dated December 21, 2000 defendants notified plaintiffs, inter alia, that their communications with class members qualifying as "settlement discussions" would be neither produced nor logged. See plaintiffs' Exhibit N at 2. In April 2001, defendants supplied two privilege logs, neither of which contained any entries concerning settlement demands and/or discussions dating from either before or after the class actions were filed. See Plaintiffs' Exhibit O, Affirmation of Timothy Reynolds, at 4-6.
2. Plaintiffs' first discovery motion and Justice Schoenfeld's December 26, 2002 Order:
In March 2001, plaintiffs filed a motion to sanction the Citigroup defendants for their refusal to produce the missing "settlement" and other documents. Defendants countered plaintiffs' arguments by arguing that all of their settlement discussions with the underlying class action plaintiffs were per se immune from discovery because of the generalized "settlement privilege" enunciated in CPLR §4547. Defendants also contended that they had received no settlement demand(s) in either of the class actions until January or February of 1997. See plaintiffs' Exhibits O at ¶17, P at 8.
In a Decision and Order dated December 26, 2002, the Supreme Court, New York County (Schoenfeld, J.) resolved all pending motions, including the motion regarding the parties' dispute over "settlement-related" documents. See plaintiffs' Exhibit Q. While denying plaintiffs' request for sanctions, the Court ordered as follows:

The Insureds and/or the Citigroup Defendants are directed to disclose the communications with the Class Action plaintiffs and their counsel both prior to the commencement of the Class Actions and in the process of settlement. This information is material and necessary to the issue of defendants' knowledge of the scope of the liability and the likelihood that the excess coverage would be implicated.....
All disclosure directed hereinabove shall be produced within 60 days of the issuance of this decision....
Plaintiffs' Exhibit Q at 7, 10. Plaintiffs extended defendants' deadline until March 14, 2003. See Affidavit in Support of Plaintiffs' Motion by Jeffrey Leonard at 11.
3. Post-motion discovery:
On March 11, 2003, the SSB and Citigroup defendants served a "First Supplemental Response[]" to plaintiffs' June 2, 2000 Notice for Discovery and Inspection. See plaintiffs' Exhibit R. The "Supplemental Response[]" is a seven-page list of "objections" to plaintiffs' disclosure requests, both in general and in particular, on grounds including but not limited to attorney-client privilege, work-produce doctrine, joint-defense privilege, relevance, confidential information, proprietary information, business/commercial secrets, prematurity, overbroadness, vagueness, misleadingness, overly burdensomeness, argumentativeness, oppressiveness, and as violative of constitutional, statutory and/or common law privacy concerns. Insofar as plaintiffs' [*5]specific request for documents reflecting settlement discussions was concerned, defendants wrote:

24. SSB refers plaintiffs to the Objections and Responses of Defendant Salomon Smith Barney, Inc. to Plaintiffs' Joint Notice of Discovery and Inspection, dated November 27, 2000. In addition, SSB will make available to plaintiffs relevant non-privileged documents at a mutually convenient time and location.
Plaintiffs' Exhibit R.
On April 17, 2003, SSB's Skadden, Arps counsel wrote to plaintiffs' attorney that Royal had been allowed to review the voluminous file maintained by SSB's in-house counsel even prior to Justice Shoenfeld's December 26, 2002 Order; that said file had presumably contained the requested materials; and that the entire file had since been destroyed in the September 11, 2001 World Trade Center attack. In addition, Reynolds contended, after Justice Schoenfeld's Order, Royal had been "given access to the files of Paul, Weiss, counsel to SSB in the class action. To the extent that information or correspondence exists concerning communications with the class representatives or their counsel, it would have been in that production." See plaintiffs' Exhibit T.
Plaintiffs' counsel replied on April 22, 2003, inter alia, that the volume of defendants' prior document production was irrelevant where Court-ordered materials were not among the records produced. 
II. DISCUSSION:
At issue on this application are two categories of documents:
(1) Records relating to settlement demands and negotiations with the class plaintiffs, both before and after the class actions were filed. The five settlement-related documents sought by plaintiffs here bear Bates numbers SSB 866490 - SSB 866491, SSB 866492 - SSB 866495, SSB 866496 - SSB 866510, SSB 866511 - SSB 866519, and SSB 866520 - SSB 866523. These are apparently memos drafted between December 13, 1996 and March 3, 1997 by SSB's Paul, Weiss attorneys. Plaintiffs only learned of the existence of these documents in the fall of 2003, pursuant to a third-party subpoena served by them on Paul, Weiss. The documents were promptly labeled "privileged and work product" by defendants, who entered them onto their Supplemental Log dated November 13, 2003. All five of these documents which pre-date defendants' April 1997 notice to defendants of the existence of the class actions  are described as reflecting communications with class counsel, including telephone calls and settlement meetings.
(2) Documents listed on defendants' privilege logs relating to their evaluations of the gender-based claims ("assessment-related documents"). These documents include materials reflecting defendants' assessments over time of the class actions, their subsequent projections of the costs of settling the claims of the1920 women who agreed to engage in an alternative dispute resolution process, and their bases for settling 1851 of said claims.
A. The Five "Settlement-Related" Documents: Waiver and Law of the Case:
With respect to the settlement-related documents: Although the Citigroup defendants included "attorney-client privilege" and "work product" in their boilerplate responses to [*6]plaintiffs' demands to discover settlement-related documents, they abandoned those objections in, inter alia, their opposition to Royal's motion for sanctions where they refused to produce the requested discovery solely on the ground of settlement-discussion confidentiality under CPLR §4547.[FN4] See Plaintiffs' Exhibits N, O, P. In response to defendants' argument, Justice Schoenfeld ruled in December 2002 that the defendants were "to disclose the communications with the Class Action plaintiffs and their counsel both prior to the commencement of the Class Actions and in the process of settlement" within 60 days. Defendants' current suggestion that by this directive the Court meant only to free the settlement-related documents from the "settlement privilege" but not from the attorney-client and/or work product privileges is disingenuous. In their opposition to plaintiffs' motion, defendants had raised only the "settlement privilege," effectively waiving the others.
Equally unpersuasive is defendants' related suggestion that, because of the wording of his ruling, Justice Schoenfeld intended to limit the "settlement-related" discovery to only correspondence between counsel for the defendants herein and counsel for the underlying class action plaintiffs i.e., impliedly leaving protected by the "settlement privilege" all communications regarding settlement among and between SSB's various departments and its complicated network of lawyers (e.g., in-house counsel, Travelers' Law Department, Gulf's legal staff and Paul, Weiss). In fact, the dispute at issue in plaintiffs' original motion concerned plaintiffs' demands for discovery of all "information concerning the settlement negotiations between SSB and the class action plaintiffs." Emphasis supplied; see Reynolds Affirmation in Opposition, dated April 5, 2001, Exhibit O to Plaintiffs' Motion, at 11. To the extent that the wording of Justice Schoenfeld's Order suggests that his disclosure directive was limited to references to settlement in defendants' correspondence with counsel for the class action plaintiffs and no one else, the Court concludes that the sentence was inartfully composed, as it would make no sense to direct the disclosure of some kinds of settlement information while forbidding the release of other, presumably related data.
B. Assessment-Related Discovery
1. The Attorney-Client Privilege:
Defendants also seek to withhold documents reflecting their "assessments" of the class action plaintiffs claims, on the grounds that such evaluations are protected by the attorney-client privilege. See CPLR 3101(b), (c), CPLR 4503.
As a preliminary matter, the Court regards SSB's "assessments" of the various gender discrimination claims to be the "flip side" of the "settlement-related information" issue discussed above. In other words, it stands to reason that once a settlement "demand" was made by a class [*7]action plaintiff, an "assessment" by SSB would have followed, after which "negotiations" would have ensued. And, indeed, several of the documents listed on the privilege logs have such hybrid descriptions as "Case Assessment/Report reflecting legal advice re: Settlement offer analyses." If "settlement-" and "negotiation-related" documents are discoverable pursuant to Justice Schoenfeld's ruling, it stands to reason that documents reflecting claim "assessment" the intermediate stage between "demand" and "negotiation" should be discoverable as well, as part of the "information concerning settlement negotiations" that Justice Schoenfeld ordered disclosed.
It is not disputed that SSB's/Travelers' "Law Department" investigated the underlying gender-based claims from their inception, pursuant to an internal policy, memorialized in a Memorandum dated December 1, 1994, requiring the Law Department to "manage" all "extended personal injury claims." Even were the Court to credit defendants' counsel's unsupported assertion that all assessments performed by defendants' Law Department in the course of their routine "management" of these claims contain attorney-client confidences, the Court would conclude that any assessment-related materials that pre-dated September 10, 1997  when Royal disclaimed coverage  would be discoverable by Royal under the "common interest" doctrine. According to that doctrine, communications between an insured and its attorney connected with the defense of underlying litigation are normally not privileged vis-a-vis the insured's carriers in subsequent litigation. See, e.g., Eureka Investment Corp. v. Chicago Title Ins. Co., N.V., 743 F.2d 932, 936-937 (D.C. Cir. 1984); Independent Petrochemical Corp. v. Aetna Cas. and Sur. Co., 654 F.Supp. 1334 (D.D.C. 1986), aff'd 944 F.2d 946 (D.C. Cir. 1991), cert. den. 503 U.S. 1011 (1992); Car & General Ins. Corp. v. Chicago Title Ins. Co., 179 F.Supp. 888, 890-891 (S.D.N.Y. 1959), aff'd 277 F.2d 162 (2d Cir. 1960); Truck Ins. Exchange v. St. Paul Fire & Marine Ins. Co., 66 F.R.D. 129, 133-136 (E.D.Pa. 1975); Southeastern Pennsylvania Transp. Auth. v. Transit Cas. Co., 55 F.R.D. 553, 557 (E.D.Pa. 1972).
"The crux of this dispute is whether the 'common interest' doctrine trumps [defendants'] claims of privilege where there is admittedly a common interest between the insurers and insureds in minimizing exposure in the underlying [gender-discrimination] claims, but where there is also sharp dispute between insurers and insureds regarding insurance coverage."
Independent Petrochemical Corp., supra, at 1365. The Court finds that at least up until the time that Royal disclaimed coverage on September 10, 1997, SSB and its primary insurers did not prepare their documents expecting that their assessments and settlement postures would be concealed from their excess insurance carriers. Rather,

[t]he documents were generated in anticipation of minimizing something of common interest to both [defending] parties in [the underlying] suit[s]: exposure to liability from tort claimants. In short, [defendants] had no reasonable expectation of confidentiality with regard to these documents.
Id. Indeed, the record reveals that up until September 10, 1997, Royal was a participant in negotiations among and between the class action plaintiffs, SSB, SSB's lawyers and SSB's primary carriers, attending settlement meetings with them on June 26, August 12, and August 15, 1997. Accordingly, the pre-September 10, 1997 "settlement-" and "assessment-"related documents for which attorney-client privilege is now being claimed are not privileged because [*8]they were not "prepared in an atmosphere of uncertainty as to the scope of any identity of interest shared by the parties." See Vermont Gas Systems, Inc. v U.S. Fid. & Guar. Co., 151 FRD 268, 277; cf. Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp., 2002 WL 3172693 (S.D.N.Y. December 5, 2002).[FN5]
However, as discussed below, because the Court concludes that all of the assessment-related material on defendants' logs is covered by the "at issue" doctrine, it directs release of the post-September 10, 1997 documents as well.
.2. The Work Product Doctrine:
The "work product" doctrine applies only to documents that were prepared "principally or exclusively to assist in anticipated or ongoing litigation," and is not designed to protect documents prepared in the "regular course of business" (including claim investigations). In other words, "if a party prepares a document in the ordinary course of its business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation." See Martin v. Valley National Bank of Arizona, 140 F.R.D. 291, 304 (S.D.N.Y. 1991). "As for 'anticipation of litigation,' courts have made clear that, because litigation can be anticipated at the time almost any incident occurs, a substantial and significant threat of litigation is required before a discovery opponent's anticipation will be considered a reasonable and justifiable motivation for production of a document." Harper v. Auto-Owners Ins. Co., 138 F.R.D. 655, 659 (S.D. Ind. 1991). "[T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the documents can fairly be said to have been prepared or obtained because of the prospect of litigation." The privilege is not necessarily vitiated by the fact that the document was prepared in anticipation of litigation with another party rather than with the parties to the current lawsuit, since work product protection applies to materials prepared for an earlier action where the actions are closely related in parties and/or subject matter. See F.T.C. v. Grolier, Inc., 462 U.S. 19, 25 (1983); see also Hercules, Inc. v. Exxon Corporation, 434 F.Supp. 136, 153 (D. Del. 1977); Slate v. State, 268 A.D.2d 857 (3d Dept. 2000) ("an attorney's work product is privileged both in the context of the litigation for which it was prepared and in that of any subsequent legal proceedings"); Corcoran v. Peat, Marwick, Mitchell & Co., 151 A.D.2d 443, 445 (1st Dept. 1989). In the instant case, the tort actions between the class action plaintiffs and SSB are clearly related to the within declaratory judgment litigation between Royal and SSB.
However, the Court concludes that only assessment documents post-dating May 20, 1996 could qualify for work product status, because only after May 20, 1996 could "assessments" be [*9]considered to have been created in a context of "objective facts establishing an identifiable resolve to litigate." Harper v. Auto-Owners Ins. Co., supra. As the Court observed in International Surplus Lines Insurance Co. v. Willis Corroon Corp., 1992 WL 345051 (N.D.Ill. Nov. 12, 1992)  citing Binks Mfg. Co. v. National Presto Industries, Inc., 709 F.2d 1109, 1118 (7th Cir. 1983), and Janicker v. George Washington University, 94 F.R.D. 648, 650 (D.D.C. 1982)  to qualify for the "work product" privilege, a discovery opponent must show that "'the primary motivating purpose behind the creation of a document must be to aid in possible future litigation,' under circumstances where the discovery opponent can show 'objective facts establishing an identifiable resolve to litigate.'" The first such qualifying "objective fact" in the record before the Court is commencement of the Martens class action on May 20, 1996. See also Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp., supra.[FN6]
Notwithstanding the foregoing, the Court concludes that all documents regarding assessment and settlement marked "work product" in defendants' privilege logs even those generated after May 20, 1996 are subject to disclosure, because they qualify for both the "at issue" and "substantial need" exemptions from privilege, as discussed below.
C. The "At Issue" and "Substantial Need" Exceptions:
1. "At Issue":
Under the "at issue" doctrine, the attorney-client privilege and the work product doctrine can be deemed to be waived where a party advances claims or defenses that place protected information "at issue" that is, "where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information." IMO Industries, Inc. v. Anderson Kill & Olick, P.C., 192 Misc.2d 605, 609 (Sup. Ct., N.Y. Co. 2002); see also Orco Bank, N.V. v. Proteinas Del Pacifico, S.A., 179 A.D.2d 390 (2d Dept. 1992); Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465 (S.D.N.Y. 1993). As the privilege-exception is sometimes formulated, a party is treated as having waived its privileges where: (1) assertion of the privilege was the result of some affirmative act [here, defendants' claims against their excess carriers] by the non-disclosing party; (2) through this affirmative act, the non-disclosing party put the protected information at issue; and (3) application of the privilege would have denied the opposing party access to information vital to its ability to resist the non-disclosing party's affirmative act. See Remington Arms Co. v. Liberty Mutual Ins. Co., 142 F.R.D. 408, 414, fn. 4 (D.Del. 1992).
In the matter at bar, the defendants bear the burden of establishing that the notice they provided to plaintiffs was timely under the notice provisions of the policies, since timely notice is a "condition precedent" to coverage. See City of Utica v. Genesee Management, Inc., 934 F.Supp. 510, 519 (N.D.N.Y. 1996); SSBSS Realty Corp. v. Public Serv. Mut. Ins. Co., 253 A.D.2d 583 (1st Dept. 1998). In order to carry their burden, defendants will have to establish that the timing and quantity of the demands they received from the class action plaintiffs, and the assessments made of these demands by defendants' own counsel, made it reasonable for notice to have been withheld from plaintiffs until late March of 1997. Defendants cannot establish that [*10]they provided timely notice to Royal while at the same time refusing to disclose the information that would either prove or disprove that threshold assertion. See Byers v. Burleson, 100 F.R.D. 436 (D.D.C. 1983) (privilege waived where information sought was necessary to resolve issue essential to the non-disclosing party's case).[FN7]
Accordingly, the Court concludes that defendants' attorney-client and work-product defenses to disclosing all documents relating to "settlement" and "assessment" listed in their privilege logs are overcome by the "at issue" doctrine on the facts of this case.
2. "Substantial Need":
Plaintiffs also have a substantial need for the withheld "assessment" materials, since the allegedly "privileged" "work product" records relate to central issues in the case such as late notice and settlement-fund-allocation, as well as the reasonableness of the settlements. Moreover, plaintiffs cannot obtain the substantial equivalent of these materials without undue hardship. See Lamitie v. Emerson Electric Co., supra at 1083; CPLR 3101(d)(2). Defendants' suggestion that plaintiffs can extract all relevant information at depositions is unreasonable, because defendants' witnesses are unlikely to remember in 2004 the details of settlement demands, discussions and assessments held seven to eight years ago. Accordingly it is
ORDERED that plaintiffs' motion in effect to compel defendants to produce settlement- and assessment-related documents listed on their privilege logs is granted; and it is further
ORDERED that defendants are directed to produce said documents within 30 days of service upon them of a copy of this Order with notice of entry.
The foregoing constitutes the Decision and Order of the Court.
Date: June 29, 2004 
New York, New York
SHIRLEY WERNER KORNREICH
Footnotes

Footnote 1:The Travelers Group, Inc., The Travelers, Inc., Travelers Casualty & Surety Co., Gulf Insurance Company ("Gulf") and Primerica Corp., formerly named as defendants, have since been dismissed from the case by Order of the Supreme Court, New York County (Schoenfeld, J.) dated August 29, 2001; and on June 4, 2001, plaintiffs voluntarily discontinued their claims against another defendant, Hartford Accident and Indemnity Co. Smith Barney, Inc. is allegedly the predecessor in interest of defendant Salomon Smith Barney, Inc., a wholly-owned subsidiary of defendant Salomon Smith Barney Holdings, Inc., which in turn is a wholly-owned subsidiary of defendant Citigroup, Inc. In addition, Citigroup, Inc. is allegedly the successor in interest to Travelers Group, Inc., the successor in interest to The Travelers, Inc., the successor in interest to Primerica Corp. 

Footnote 2:During the relevant time period, Salomon Smith Barney's primary liability coverage was provided by Gulf (from April 1, 1993 to April 1, 1994) and then by Travelers Indemnity Company of Illinois ("Travelers") (from April 1, 1994 to April 1, 1997). So far as can be told from the instant record, the primary insurers have defended and indemnified Salomon Smith Barney for the underlying claims and have notified Royal of the exhaustion of the applicable "personal injury" limits of their coverage. It is part of plaintiffs' theory of their case that the insureds placed the interests of their corporate siblings and primary insurers, Travelers and Gulf, ahead of plaintiffs' interests by improperly exhausting the primary policies in order to reach the excess policies.

Footnote 3:Smith Barney acquired Shearson on July 31, 1993.

Footnote 4:The Court notes that the CPLR 4547's prohibition against admitting at trial evidence of settlement negotiations expressly declares the prohibition to be inapplicable when "such evidence ... is offered for another purpose, such as negating [or substantiating] a contention of undue delay...." Plaintiffs require evidence of settlement negotiations not "as proof of liability for or invalidity of the claim or the amount of damages," but rather to establish when defendants had reason to suspect that the class action plaintiffs' claims were likely to exceed the coverage provided by their primary carriers (i.e., to substantiate their claim that SSB's notice to its excess carrier was "unduly delayed"). 

Footnote 5:Added to this category of discoverable materials are all records for which the "attorney client privilege" is invoked on defendants' logs that are missing the name of the sender, the name of the recipient, and/or the date. Clearly, where the parties to the communication are unclear, no attorney-client privilege can be asserted. See Stenovich v. Wachtel, Lipton, Rosen & Katz, 195 Misc.2d 99 (Sup. Ct., N.Y. Co., 2003) (document in party's "privileged log" whose author was identified by only four initials is not protected by either attorney-client or work-product privilege). Additionally, where the date is missing, it must be presumed (in the absence of clear evidence to the contrary) that the communication antedated the September 10, 1997 cut-off date, since New York's liberal discovery statutes would require any "presumption" to favor disclosure.

Footnote 6:As with the "attorney-client" privilege, undated documents or records lacking a clearly identifiable sender and/or recipient would not qualify for the "work product" privilege.

Footnote 7:In addition, there is a contested issue as to the reasonableness of the DRP settlements, and as to the allocation of the DRP settlement amounts among the various claimants based on the nature of their claims and the elements of their damages. All of the individual settlements were apparently in lump sum amounts that covered all of the grievances and potential grievances raised by each claimant  including punitive damages and intentional harassment accusations (matters not covered by Royal's insurance). Should defendants get past the "timely notice" threshold, as well as the additional hurdle of whether their primary coverage was properly and fully exhausted, there will remain an issue of the reasonableness of the settlements and the allocation of funds amongst covered and uncovered claims. See Charlotte Motor Speedway, Inc. v. International Insurance Co., 125 F.R.D. 127, 129-131 (M.D.N.C. 1989) (information concerning counsel's activities was necessary to determine whether insured met its obligations under the policy and whether settlement terms and defense costs were reasonable).